FILED
2013 Nov-18  PM 03:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 2

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FRANCES MCINTYRE THOMPSON

     Plaintiff,   C.A. NO.: 12-CV-01018-JEO

VS

RESURGENT CAPITAL
SERVICES, L.P.; PYOD, LLC,

     Defendants.

30b6
DEPOSITION OF:   TONYA HENDERSON

DATE:      October 10, 2013

TIME:      9:05 a.m.

LOCATION:   A. William Roberts, Jr. & Associates
             33 Market Point Drive
             Greenville, SC 20607

TAKEN BY:    Counsel for the Plaintiff

REPORTED BY:   MICHELE E. BECKER,
              Registered Merit Reporter

---

A. WILLIAM ROBERTS, JR., & ASSOCIATES
Fast Accurate & Friendly
Charleston, SC  Hilton Head, SC  Myrtle Beach, SC
(843) 722-8414  (843) 785-3263  (843) 839-3376

Columbia, SC   Greenville, SC   Charlotte, NC
(803) 731-5224  (864) 234-7030  (704) 573-3919

## Page 2

1  APPEARANCES OF COUNSEL:
2  ATTORNEY FOR THE PLAINTIFFS
   FRANCES MCINTYRE THOMPSON:
3
   WATTS & HERRING, LLC
4  BY: M. STAN HERRING
   The Kress Building
5  301 19th Street North
   Birmingham, AL 35203
6  (205) 879-2447
   stan@wattsherring.com
7
   ATTORNEY FOR THE DEFENDANT
8  RESURGENT CAPITAL SERVICES, L.P.; PYOD, LLC:
9  FERGUSON, FROST & DODSON, LLP
   BY: NEAL D. MOORE, III
10 2500 Acton Road, Suite 200
   Birmingham, AL 35243
11 (205) 879-8722
   ndm@ffdlaw.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1          P-R-O-C-E-E-D-I-N-G-S
2           TONYA HENDERSON
3  being first duly sworn, testified as follows:
4            EXAMINATION
5  BY MR. HERRING:
6      Q.  Will you please identify yourself for
7  the record?
8      A.  I'm Tonya Henderson.
9      MR. MOORE:  And Stan, do you want to
10 do the same thing with the stipulations we did with
11 JP?
12     MR. HERRING:  Yeah.  That's fine.
13     MR. MOORE:  Okay.
14 BY MR. HERRING:
15     Q.  And Ms. Henderson, where are you
16 currently employed?
17     A.  With Resurgent Capital Services.
18     Q.  And it's my understanding that you're
19 here today to testify as a corporate representative
20 for Resurgent?
21     A.  Yes, sir.
22     Q.  Is that your understanding also?
23     A.  Yes, it is.
24     Q.  Have you ever given a deposition
25 before today?

## Page 4

1     A.  Yes, sir.
2     Q.  How many times?
3     A.  A handful.
4     Q.  You mean like five or ten?
5     A.  I would say five or six times.
6     Q.  Okay.  And were all those depositions
7  given as an employee on behalf of Resurgent?
8     A.  On behalf of Resurgent or as a
9  designated representative for LVNV.
10    Q.  What's your job title at Resurgent?
11    A.  I'm managing paralegal.
12    Q.  Tell me what your job responsibilities
13 are.
14    A.  To supervise and review counterclaims
15 and discovery, testify at live and telephonic trials
16 as a custodian of record or a 30(b)(6) designee.
17    Q.  Is that on behalf of Resurgent or
18 LVNV?
19    A.  Yes.
20    Q.  Before we get too far, I just want to
21 remind you now how this works.  I'll be asking you
22 questions.  And if I ask an unclear question or if
23 you don't understand my question, please ask me to
24 rephrase it or repeat it and I'll be happy to do so.
25 And if you need to take a break at any time, let me

Page 5

1  know.  But if there's a question pending just, I'd
2  ask that you answer that question and then we can
3  take a break; is that fair?
4       A.   Yes, it is.
5       Q.   Okay.  Do you remember of the five or
6  six times you testified by deposition how many of
7  those were within the last year?
8       A.   Probably four were in the last year.
9       Q.   Do you remember the names of any of
10  the cases?  Or any of the plaintiffs?
11       A.   No.  Not offhand.
12       Q.   Do you remember where they were
13  pending?  Do you know what I mean by that?
14       A.   Yes, I do.
15       Q.   Do you know where this case is
16  pending?
17       A.   I know it's in Alabama.  There's a
18  couple in Tennessee.  I can't remember on the
19  others.
20       Q.   And the two in Tennessee, were those
21  for Resurgent or LVNV?
22       A.   I don't remember.
23       Q.   Do you remember the claims in any of
24  those cases, the claims that were being made by the
25  plaintiff?

Page 6

1       A.   I think I could remember some.
2       Q.   Okay.  Will you tell me what those
3  are?
4       A.   One involved the credit bureau
5  reporting, how we report to TransUnion and Experian.
6       Q.   Was that one of them in Tennessee?
7       A.   I can't remember.
8       Q.   Okay.  What else?
9       A.   I think one of them was whether LVNV,
10  in particular, had to be licensed in Tennessee.
11       Q.   Do you know if those were brought by a
12  attorney named Alan Lee?
13       A.   Yes.
14       Q.   Do you know if there was another
15  attorney on the case named Pete Barry?
16       A.   No.  I'm not familiar with him.
17       Q.   Do you remember any others?
18       A.   There was a Mr. Meachum.
19       Q.   That's one of the lawyers involved.
20       A.   Yes.  Yes.
21       Q.   Okay.  Was that in Tennessee in these
22  cases --
23       A.   Yes.
24       Q.   -- or was that just a different --
25            Okay.  Do you remember what any other

Page 7

1  cases were about?
2       A.   No.  Not offhand.  It's probably been
3  several months.
4       Q.   Okay.  You said there were
5  approximately four within the last year.  What about
6  prior to that?
7       A.   I also did a deposition in a
8  collection action, underlying collection action in
9  Ohio probably a year-and-a-half ago.
10       Q.   Do you remember where in Ohio?
11       A.   It was small town outside of Columbus,
12  but I can't recall the name.
13       Q.   Any others?
14       A.   I think that's it.
15       Q.   How many times have you testified at
16  trial?
17       A.   Too many to count.
18       Q.   Are most of them in collection
19  lawsuits?
20       A.   Yes.  Yes.  As a custodian of records.
21       Q.   What about in lawsuits where LVNV or
22  Resurgent or some other Sherman entity is being
23  sued, how many times have you testified on behalf of
24  one of those entities at a trial?
25       A.   Only once.

Page 8

1       Q.   Okay.  And do you remember the name of
2  that case?
3       A.   I don't remember the name of the case.
4  I think it would be Gray versus maybe LVNV.
5  Resurgent might have been named as well.
6       Q.   Just generally do you remember what
7  the claims were?
8       A.   Yes.  It was in regards to bankruptcy
9  and how we scrubbed and identified bankruptcy
10  accounts.
11       Q.   Had LVNV collected on an account that
12  had been discharged in bankruptcy or attempted to?
13       A.   I can't recall whether there was any
14  collection.  I believe we reached out to speak to
15  the consumer.
16       Q.   Explain to me how that's different
17  than collection?
18            MR. MOORE:  If you understand his
19  question, go ahead and answer it.
20  BY MR. HERRING:
21       Q.   Do you understand my question?
22       A.   I think I do.  I understand collection
23  as in accepting and taking of money.
24       Q.   Okay.  What about when you write a
25  letter -- when LVNV or Resurgent or somebody writes

Page 9

1  a letter to a consumer and asks them to pay a debt,
2  do you consider that to be a collection or
3  collection efforts?
4       A.   I consider it to be a collection
5  activity.
6       Q.   Okay.  Well, I guess explain to me the
7  distinction you were drawing between reaching out to
8  talk to somebody and collection.
9       A.   By collection I was thinking that you
10 were implying we had seized her money, we had
11 actually collected on the money.
12      Q.   Do you know if that, in fact, occurred
13 in that case?
14      A.   I can't remember.
15      Q.   Do you know where that case was
16 pending?
17      A.   In Alabama.
18      Q.   Do you know what the result of that
19 case was?
20      A.   Yes.  The judge found in our favor.
21      Q.   Was there a jury or just a judge?
22      A.   Just a judge.
23      Q.   Who did that?
24           MR. HERRING:  Do you know who brought
25 it?

Page 10

1            MR. MOORE:  Nick Whooten.
2            MR. HERRING:  Figures.
3  (PLF. EXH. 5, Re-Notice to Take Deposition of
4  30(b)(6) Corporate Representative or Resurgent
5  Capital Services, L.P., was marked for
6  identification.)
7  BY MR. HERRING:
8       Q.   I'm handing you Exhibit 5 to your
9  deposition.  And for the record we're continuing the
10 numbering from the previous deposition of the PYOD
11 representative that contained Exhibits 1 through 4.
12 So we're going to start this deposition with
13 Exhibit 5.
14           Have you seen this deposition notice
15 before today?
16      A.   Yes.  I have.
17      Q.   Have you reviewed the categories of
18 deposition in preparation for your deposition?
19      A.   Yes.
20      Q.   Okay.  Are there any categories that
21 you're not prepared or qualified to testify to?
22           MR. MOORE:  Object to the form of that
23 question.  But I don't know if she's in a position
24 to -- I don't think she memorized every one of those
25 things and, you know, we filed objections to

Page 11

1  multiple ones of them as well.  So there very well
2  could be some things listed on here that she's not
3  prepared to testify about, or that I wouldn't let
4  her testify about.
5  BY MR. HERRING:
6       Q.   Well, please look through the
7  categories and take your time and tell me what
8  categories you're not qualified to testify about as
9  a corporate representative for Resurgent.
10           MR. MOORE:  And your question is what
11 she's qualified to talk about?  And the reason I'm
12 henpecking it is, like, for example, number three,
13 the collection methods, practices, techniques and
14 strategies used by defendant.  She's qualified to
15 talk about that.  She's not going to be talking
16 about the collection strategies and practices and
17 techniques to the extent they don't relate to what
18 happened in this case, so...
19           MR. HERRING:  Well, we'll get into
20 that.  I mean, that's an entirely different
21 question.  This is a corporate rep deposition, and
22 these are the categories.  And if there's a category
23 that she's not prepared for qualified to testify
24 about, that's an entirely different matter than --
25           MR. MOORE:  I'm just making sure you

Page 12

1  want to know if the question is what she's qualified
2  to testify about.
3            THE DEPONENT:  I'm sorry.  What was
4  the question again?
5  BY MR. HERRING:
6       Q.   Are there any areas, category or
7  categories of the 21 categories for this deposition
8  that you are not qualified to talk about?
9       A.   I believe I'm qualified to talk about
10 all of them.
11      Q.   How long have you been employed for
12 Resurgent?
13      A.   Since June 2011.
14      Q.   And how long have you been in the debt
15 collection industry?
16      A.   The same, since June 2011.
17      Q.   And how long have you been a
18 paralegal?
19      A.   Since 1994.
20      Q.   Okay.  And when did you graduate high
21 school?
22      A.   1988.
23      Q.   And so since 1988, the first time you
24 worked in the debt collection industry was
25 June 2011; is that correct?

Page 13

```
1          A.   Yes.
2          Q.   And when you became a paralegal did
3    you go to work for a law firm?
4          A.   Yes, I did.
5          Q.   Okay.  Before you came to Resurgent in
6    June 2011, where were you employed?
7          A.   Porter & Rosenfeld.
8          Q.   And is that here in Greenville?
9          A.   Yes, it is.
10         Q.   And what kind of work do they do?
11         A.   They specialize in family law.
12         Q.   And what kind of work did you do for
13   them?
14         A.   Draft pleadings, respond to discovery,
15   issue subpoenas.  Anything required by the attorneys
16   in the family law practice.
17         Q.   Okay.  And how long were you with
18   them?
19         A.   I was only with them about ten months.
20         Q.   Did you ever work for a law firm that
21   did debt collection work?
22         A.   Not to my knowledge.
23         Q.   Were you ever fired from any of your
24   jobs as a paralegal?
25         A.   Yes.
```

Page 14

```
1          Q.   When was that?
2          A.   In 2010.
3          Q.   And who were you employed with at the
4    time?
5          A.   Gallivan, White & Boyd.
6          Q.   Any other time?
7          A.   No.
8          Q.   And why were you fired from Gallivan,
9    White & Boyd?
10         A.   I had a disagreement with an associate
11   that I was working for.
12         Q.   And just generally what was the
13   disagreement about?
14         A.   That particular day the disagreement
15   was about some medical records we were introducing
16   into evidence in a case.
17         Q.   What year was the associate?
18         A.   She had -- it was about her second
19   year at the firm.
20         Q.   So I take it you-all hadn't gotten
21   along very well?
22         A.   Not very well.  My shareholder partner
23   had been called back into the Reserves, and that's
24   who I worked for.  And she had already gotten me
25   fired before they could contact him for his opinion.
```

Page 15

```
1    He had called her on the carpet multiple times for
2    how she treated me and other employees.
3          Q.   And they didn't rehire you or you
4    just --
5          A.   They wanted to.
6          Q.   But you didn't want to go back?
7          A.   No.
8          Q.   Off the record.
9               (Off-the-record.)
10   (PLF. EXH. 6, Resurgent Capital Services Credit
11   Bureau Reporting Policy, was marked for
12   identification.)
13   BY MR. HERRING:
14         Q.   All right.  Back on the record.
15              Tell me -- and if I already asked this
16   I apologize.  But tell me what documents you
17   reviewed to prepare for your deposition.  I think I
18   asked you what you did, but...
19              MR. MOORE:  I don't think you asked
20   for that.
21              MR. HERRING:  I didn't?  Okay.
22              THE DEPONENT:  No.
23   BY MR. HERRING:
24         Q.   Well, tell me what you did to prepare
25   for your deposition.
```

Page 16

```
1          A.   Well, I read the complaint.  I
2    reviewed discovery.  I reviewed document production.
3    And then I investigated our records, database and
4    systems in preparation.
5          Q.   Did you review the answer your lawyer
6    filed in this case?
7          A.   I read through it briefly.
8          Q.   Okay.  Before Resurgent counsel got
9    involved, do you know if there was an internal
10   investigation done into the claims made by the
11   plaintiff in this case?
12         A.   There was a dispute investigation.
13              MR. MOORE:  Again, I don't think
14   you -- listen to his question.  He's asking about
15   the claims of the lawsuit.
16              THE DEPONENT:  Not to my knowledge.
17   BY MR. HERRING:
18         Q.   Now, when you say, dispute
19   investigation, are you referring to the -- well,
20   what are you referring to?
21         A.   I was referring to once the consumer
22   had sent in a letter to the collection agency, and
23   it placed her account in our dispute work flow.
24         Q.   And are there --
25              MR. HERRING:  Would you read that
```

Page 17

1    answer back for me?
2         COURT REPORTER:  Sure.
3         (Answer read back as instructed.)
4    BY MR. HERRING:
5         Q.   Are there account notes or collection
6    notes that evidence that dispute and what was done
7    to investigate that and the response that went out?
8         A.   Yes.
9         Q.   Okay.  These have been produced to us
10   in various ways.  So I'm handing you a stack of
11   documents which we've received from your lawyer,
12   some together and some at different times.  So just
13   look through that stack, if you would, and tell me
14   which sets of those documents would evidence what
15   you're talking about?
16        A.   The account event history.  And the
17   print screens of AM customer service module and this
18   print screen from SoundBite would reference what the
19   dispute work flow did in this case.
20        Q.   Okay.  And the final set of documents,
21   what Bates numbers are those?
22        A.   This particular set?
23        Q.   Yeah.  That final set that you're
24   looking at.
25        A.   RES 19.

Page 18

1         Q.   That's several copies, by the way, so
2    don't start over.
3         A.   Through 22.
4         Q.   Okay.  And what are those?
5         A.   I believe these are the notes provided
6    by Nationwide.
7         Q.   Okay.  And if you'll take that binder
8    clip off the top, I think the second set, tell me if
9    that's the same copy, the one that has the colored
10   picture on the front, if that's the same thing as
11   the Bates stamped 19 through 22.  And it may just be
12   a clearer copy of the print screen and following
13   documents.
14        A.   It appears to be the same.
15        Q.   Okay.  All right.  If you'll hand all
16   those back to me we'll mark those.
17   (PLF. EXH. 7, Account Event History Start Date
18   2/13/2003 - End Date 2/13/2013, was marked for
19   identification.)
20   BY MR. HERRING:
21        Q.   Okay.  I'm handing you Exhibit 7 to
22   your deposition.  Will you identify that for the
23   record?
24        A.   Certainly.  It's an account event
25   history produced from AMCS.

Page 19

1         Q.   And what is AMCS?
2         A.   AMCS is a software that is proprietary
3    to Resurgent Capital Services.  It's what we use.
4    It's the software we use to place the account
5    information.
6         Q.   And by "we" you mean Resurgent?
7         A.   Yes, I do.
8         Q.   And what does AMCS stand for?  If you
9    know.
10        A.   I know this.  I'm trying to remember.
11   Account master customer service.
12        Q.   And you said it's proprietary.  Is it
13   a system that was created by Resurgent?
14        A.   Yes, it was.
15        Q.   Was that done internally or did
16   Resurgent hire some third-party vendor to do that?
17        A.   To my knowledge it was done internally
18   by our IT department.
19        Q.   Is there a software manual or is there
20   a manual that describes the system and the various
21   account screens or collection screens and how to
22   navigate through the system and enter input commands
23   and that kind of thing?
24        A.   If so, I'm not aware of it.
25        Q.   How are Resurgent employees trained on

Page 20

1    how to input and read -- or input data, navigate
2    through the system, and print out reports on the
3    AMCS system?
4         A.   Resurgent trains hands-on in a
5    training room with computers in front of you.
6         Q.   Is there any kind of training manual
7    that is used?
8         A.   No.
9         Q.   Is there a PowerPoint or slide
10   presentation?
11        A.   There might be for customer service.
12        Q.   Okay.  And tell me what customer
13   service does at Resurgent.
14        A.   Customer service would handle any
15   incoming phone calls, any incoming correspondence.
16        Q.   The collector or collectors that would
17   have spoken with Ms. Thompson, what department would
18   they have been in?
19        A.   They would have been inbound customer
20   service.
21        Q.   Did you say inbound?
22        A.   Inbound.
23        (Deponent moves head up and down.)
24        Q.   Looking at these notes can you tell me
25   the various departments that would have had access

Page 21

1    to this file -- well, scratch that.
2            Can you tell me what departments would
3    have done work on the file in attempting to collect
4    the debt?
5        A.   Once the account was placed with
6    Resurgent, shortly thereafter it went to Nationwide
7    Credit for collection.  Nationwide Credit received
8    correspondence from the consumer, and then when it
9    returned to Resurgent it was recalled to work the
10   written dispute that they had received from the
11   consumer.  So it would have went to customer service
12   inbound for their dispute work flow to process.  And
13   that would be a team of individuals that would try
14   to reach out and investigate the dispute that the
15   consumer had.
16       Q.   How many calls were made to
17   Ms. Thompson on this file?
18       A.   Well, there were multiple attempts at
19   a call.
20       Q.   Okay.  Where are you looking at this
21   information?
22       A.   On this report on page 4 of 6.
23           MR. MOORE:  And you're only asking
24   about Resurgent, right?  You're not asking about
25   what Nationwide may have done when you say how many

Page 22

1    calls were made?
2            MR. HERRING:  Well, I'll clarify that
3    with her.  I'm not deposing you.  So she and I will
4    work through that.
5            MR. MOORE:  Well, I'll help you out
6    when the questions aren't clear.
7            MR. HERRING:  No.  You can object to
8    the form.
9            MR. MOORE:  I will.
10           MR. HERRING:  You can object to the
11   form, okay.
12           MR. MOORE:  I object to the form.
13   Your question is unclear.
14           Are you talking about Resurgent or are
15   you talking about Nationwide?
16           MR. HERRING:  She can ask me if she
17   doesn't understand.  You can object to the form.
18   But you're not going to sit here and coach her and
19   try to interpret the question for her.
20           MR. MOORE:  I'm not telling her what
21   to answer.  I'm trying to make sure she understands
22   your question.  There's a big difference and you
23   know it.
24           MR. HERRING:  Object to the form, you
25   know.  Don't sit here and interpret the question and

Page 23

1    all that.
2            MR. MOORE:  I'm going to do whatever I
3    want to do to make sure that my witness understands
4    the questions that are being asked.  There's nothing
5    wrong with that objection.  There's no coaching of a
6    witness going on and you know it.
7            MR. HERRING:  No, I don't know it.  I
8    think you're coaching your witness.
9            MR. MOORE:  Well, and the question was
10   how many calls were placed to this woman.  And I
11   don't know if you're talking about from day one or
12   from just what Resurgent did, so...
13           MR. HERRING:  Well, and I'm not
14   disposing you, Neil.  So it doesn't matter if you
15   know or not.  I'm deposing your witness.
16           MR. MOORE:  Well, you've got my
17   objection on the record.  And if you understand his
18   question, please answer it.
19           THE DEPONENT:  Can you ask the
20   question again?
21           MR. HERRING:  Will you read my
22   question back, please.
23           (Question read back as instructed.)
24           THE DEPONENT:  Okay.  On page 4 of 6
25   shows the calls that were attempted by Resurgent

Page 24

1    Capital Services.
2    BY MR. HERRING:
3        Q.   According to this record when was the
4    first call attempted by Resurgent?
5        A.   According to our records on
6    March 13th, 2012.
7        Q.   And was the last call on March 28th,
8    2012?
9        A.   The last attempt was, yes.
10       Q.   Do you know how many times somebody
11   according to these collection notes -- according to
12   these collection notes do you know how many times
13   someone at Resurgent spoke with Ms. Thompson?
14       A.   These collection notes wouldn't
15   reflect whether or not someone spoke with
16   Ms. Thompson.  Only an attempt was made.
17       Q.   Okay.  Have you seen notes that would
18   reflect that?
19       A.   Yes, I have.
20   (PLF. EXH. 8, SoundBite Report, was marked for
21   identification.)
22   (PLF. EXH. 9, SoundBite Account Information, was
23   marked for identification.)
24   (PLF. EXH. 10, Nationwide Notes, was marked for
25   identification.)

Page 25

```
1    BY MR. HERRING:
2        Q.   I'm handing you Exhibit 8, 9 and 10 to
3    your deposition.  Can you identify Exhibit 8?
4            MR. MOORE:  Thank you.
5            THE DEPONENT:  Exhibit 8 is a print
6    screen from an external vendor we use.  It's a
7    report issued by SoundBite.
8    BY MR. HERRING:
9        Q.   And what -- just tell me generally
10   what does that report document?
11       A.   This report documents the automated
12   caller attempts that were actually received or
13   delivered to the consumer.
14       Q.   And by received or delivered, tell me
15   what you mean.
16       A.   What I mean is, the other reports
17   showed us automated calls that were trying to reach
18   the consumer.  The SoundBite report actually shows
19   the calls that made contact with the consumer in
20   some form or another.
21       Q.   Does this report distinguish between
22   calls that result in a human being answering the
23   phone versus an answering machine?
24       A.   Yes, it does.
25       Q.   Okay.  So each one of these should
```

Page 26

```
1    document a conversation between someone at the
2    number that was dialed and Ms. Thompson's residence
3    and someone at Resurgent; is that correct?
4            MR. MOORE:  Object to form.
5            THE DEPONENT:  What do you mean by
6    document?
7    BY MR. HERRING:
8        Q.   Well, let me ask it this way:  Do
9    these four calls here on 3/13/12, 3/19/12, 3/23/12
10   and 3/27/12, were those -- did all those calls
11   result in a conversation between someone at
12   Resurgent and someone at the number that was dialed?
13       A.   No.
14       Q.   Okay.  How do you know that?
15       A.   Because our system records every
16   conversation between the consumer and a live person
17   at Resurgent.  This record would only show me that
18   the call was delivered and whether a person answered
19   the phone or whether a machine answered the phone
20   and how many seconds the call lasted, the duration.
21       Q.   Okay.  Maybe I misunderstood your
22   answer a minute ago, but I thought you had said that
23   it didn't document calls where a machine answered
24   the phone?  I just misunderstood you.
25       A.   No.  It does document whether or not a
```

Page 27

```
1    person answered versus a machine answered.
2        Q.   Okay.
3        A.   It doesn't record.
4        Q.   Okay.  I think I see where the
5    confusion was.  When you say it doesn't record, tell
6    me what you mean by that.
7        A.   SoundBite is an external vendor that
8    we use.  And we do no recording through SoundBite.
9    So while it might note and distinguish between
10   whether a person or a machine answered, there's no
11   recording operations going on through SoundBite
12   itself.
13       Q.   Okay.  I think maybe where the
14   confusion was, when I said record what I meant was
15   just document the fact of a call.  But on each one
16   of these calls either a person -- each one of these
17   four calls, either a person or a machine picked up
18   on the other end; is that correct?
19       A.   Yes.
20       Q.   So for the other calls would that mean
21   that there was no answer?
22       A.   Could mean that there's no answer.
23   Could be a busy signal.  A poor line connection.
24   Our system doesn't differentiate why the call didn't
25   get through.
```

Page 28

```
1        Q.   And in looking at Exhibit 8 under the
2    result column, is that where you look to see if
3    there was a conversation between a person versus an
4    answering machine?
5        A.   It's where I look to see who answered
6    the call, yes.
7        Q.   Okay.  And does that actually tell you
8    who answered it or just whether or not a human
9    answered it versus a machine?
10       A.   Whether or not a human versus machine.
11       Q.   Okay.  And I guess just go through for
12   me if you would the various, the columns and explain
13   to me what each category is.
14       A.   Okay.  The first one is the date and
15   the approximate time of the call.
16       Q.   Okay.  Let me stop you there.  When
17   you say approximate, what do you mean by that?  Why
18   is that not the actual time on the call?
19       A.   Well, it's the actual time the call
20   initiated, started.  You would have to look at
21   duration to see the ending time.
22       Q.   Okay.  All right.  And are those
23   Eastern or Central time?
24       A.   Should be the time -- hum.  I don't
25   know.
```

Page 29

1    Q.   Well, where is SoundBite located?
2    A.   I'm not sure of SoundBite's physical
3  location. I've never asked if they were Eastern or
4  Central.
5    Q.   And so just so I'm clear on what
6  SoundBite does do, all the auto-dialed calls go
7  through SoundBite?
8    A.   For disputes, yes.
9    Q.   Okay. Explain to me the distinction.
10   A.   The distinction is the collection
11 department can use an automated dialer, they could
12 call themselves, but the dispute work flow system
13 works through SoundBite. They use SoundBite to
14 automatically reach those that have a dispute.
15 They've written in with the various disputes.
16   Q.   And why does that go through SoundBite
17 versus being kept internally at Resurgent?
18   A.   It's just a decision that we made
19 through our business solutions department to use
20 SoundBite.
21   Q.   And what does SoundBite do differently
22 than your internal system would or would not do?
23   A.   I don't know. That would have been a
24 decision just made by them at that time.
25   Q.   Is SoundBite in any way -- owned in

Page 30

1  any way by Resurgent or related or a related entity
2  to Resurgent?
3    A.   No.
4    Q.   Or Sherman?
5    A.   No.
6    Q.   And you don't know where they're
7  located?
8    A.   No. They were recently merged or
9  purchased by another company, so.
10   Q.   Do you know the name of that company?
11   A.   I don't know for sure. I think it's
12 Genesis.
13   Q.   So just so I'm clear, once a dispute
14 is made by a consumer, does the whole account go to
15 SoundBite or just the calling portion of that?
16   A.   Just the calling portion. It's an
17 external vendor that we use to make contact with the
18 consumer.
19   Q.   And once contact is made, does someone
20 at SoundBite handle that conversation or is it
21 transferred somewhere else?
22   A.   No. Once the consumer goes through
23 all the prompts and the information is given to the
24 consumer, the mini Miranda, whether or not they want
25 English or Spanish and can confirm that they are the

Page 31

1  correct individual, they're then connected to a live
2  operator at Resurgent in the dispute work flow team.
3    Q.   And that live operator is an employee
4  of Resurgent?
5    A.   Yes, sir.
6    Q.   Okay. The prompts you were talking
7  about that you listed, have you seen a script for
8  that or heard a recording of that?
9    A.   Yes.
10   Q.   Okay. And does Resurgent have a copy
11 of that, if you know?
12   A.   Yes, we do.
13       MR. HERRING: That's convenient.
14       MR. MOORE: I thought you might ask
15 for it.
16       MR. HERRING: All right. So your
17 lawyer has handed me six pages of a document
18 identified at the bottom as SoundBite
19 Communications, Inc. And the first page says:
20 Script slash call flow.
21       Just looking at that, is that the call
22 flow that you were just talking about?
23       THE DEPONENT: Yes, it is.
24       MR. HERRING: Off the record.
25 (PLF. EXH. 11, Scripting/Call Flow, was marked for

Page 32

1  identification.)
2        MR. HERRING: Back on the record.
3  BY MR. HERRING:
4    Q.   I'm attaching to your deposition
5  Exhibit 11 that was produced five minutes ago by
6  your lawyer. Describe for the record what this
7  document is.
8    A.   This document is a scripting call flow
9  for SoundBite which basically means the information
10 that they would give in their introductions and
11 prompts to the consumer.
12   Q.   When was this document created?
13   A.   I do not know.
14   Q.   When did it go into use by SoundBite
15 as a part of their calling efforts on behalf of
16 Resurgent?
17   A.   I don't know when SoundBite started
18 using it.
19   Q.   And how do you know it was used in
20 this case?
21   A.   I know it was in use in 2012. I can't
22 tell you when we began. But it certainly was used
23 in 2012. And it was certainly used to call out to
24 this consumer.
25   Q.   And how do you know that? First of

Page 33

```
1    all, how do you know it was in use in 2012?
2        A.   Because through our business solutions
3    department when I was investigating all the claims
4    of the case we spoke with the SoundBite account
5    manager.  This account, SoundBite, was in use by
6    Resurgent through the work flow dispute team in
7    March of 2012.  And they were able to provide the
8    script flow and the SoundBite report.
9        Q.   And the SoundBite report is Exhibit 8;
10   is that correct?
11       A.   Yes.
12       Q.   And the script flow is Exhibit 11; is
13   that correct?
14       A.   Yes.
15       Q.   And when did this conversation take
16   place?
17       A.   Within the last week.
18       Q.   And when did you receive these two
19   documents?
20       A.   I received them within the last week.
21       Q.   Okay.  Well, I just got them yesterday
22   and today.  Do you know how long you've had them?
23       A.   Within the last five days.
24       Q.   Do you know if this script was
25   approved by Resurgent?
```

Page 34

```
1        A.   Yes, it was.
2        Q.   Do you know if it was drafted by
3    Resurgent?
4        A.   I do not know who drafted it.
5        Q.   And how do you know that this is used
6    on every call?
7            MR. MOORE:  Object to form.
8            THE DEPONENT:  Because just the way
9    the system works.
10   BY MR. HERRING:
11       Q.   How do you know that?
12       A.   Because it's how we set up the system.
13       Q.   This is how Resurgent set up the
14   system or how SoundBite set up the system?
15       A.   It's how Resurgent set up the system
16   with SoundBite.
17       Q.   Okay.  And I guess I'm just trying to
18   understand the basis of your knowledge for the fact
19   that this is used by Resurgent on every call and was
20   used on all four calls where contact was made in
21   this case.  I mean, have you read it somewhere?  Did
22   somebody tell you?  Were you a part of setting up
23   the system or what?
24       A.   I was not a part of setting up the
25   system.  However, I have met, spoken, learned how
```

Page 35

```
1    the system works with our business department, our
2    business solutions department, and through
3    conversations with our account manager at SoundBite
4    to gain a clear understanding of exactly how the
5    calls work, how the system works.
6        Q.   And the information that was provided
7    as to the fact that this script would have been
8    followed on the four calls identified in Exhibit 8,
9    did that information come from the person at
10   SoundBite?
11           MR. MOORE:  Object to the form.
12   BY MR. HERRING:
13       Q.   That probably wasn't a very good
14   question.  But do you understand what I'm asking?
15       A.   Not really.
16       Q.   The fact that this script/call flow
17   was used on each of the four calls documented in
18   Exhibit 8, did you obtain that information from your
19   conversations with somebody at SoundBite?
20       A.   This information came from SoundBite
21   and Resurgent.
22       Q.   By this information?
23       A.   I'm sorry, Exhibit 11.
24       Q.   Okay.  I'm confused.  I thought
25   earlier you said that this was supplied to you
```

Page 36

```
1    within the last week by SoundBite.
2        A.   It was supplied to me through meetings
3    with SoundBite and our business solutions department
4    when they identified that there was a script.  I
5    wanted to know about the prompts that SoundBite
6    gives to the consumer.
7        Q.   Uh-huh.
8        A.   And they said, well, we do have the
9    script that SoundBite has to use where it has the
10   mini Miranda and the information.
11       Q.   When you said they have -- they said
12   that we have the script, who is the "they" and who
13   is the "we"?
14       A.   Resurgent and SoundBite both have a
15   copy of this script.
16       Q.   Okay.
17       A.   Resurgent and SoundBite, whether they
18   work collectively together to build this script, I
19   can only assume because it has the language that
20   Resurgent would require.  However, this is the
21   script that SoundBite uses and is incorporated into
22   all of our calls for dispute work flow.
23       Q.   And so the system that makes the call
24   is at SoundBite?
25       A.   Yes.
```

Page 37

1      Q.   And just to be clear, I'm referencing
2   the calls in Exhibit 8.
3      A.   Yes.
4      Q.   And the system that when it makes the
5   call would have to, I guess, play the script or the
6   recording that is, I guess, this scripting call
7   flow, that would be at SoundBite?
8      A.   Yes.
9      Q.   And so whether or not that actually
10  happened on any of these calls, to know that for
11  sure we'd have to talk to somebody at SoundBite?
12      MR. MOORE:   Object to form.
13      THE DEPONENT:   I don't believe so.
14  BY MR. HERRING:
15      Q.   Okay.  And I guess what I'm getting at
16  is, you've testified as to what is supposed to
17  happen, that there's a script, there's a call made,
18  and there's a script that's supposed to be played.
19  And I guess I'm trying to understand how you know
20  whether that actually happened on these four calls
21  or not?
22      A.   Because of the way the system is set
23  up, it's the only thing that can happen.  Once
24  SoundBite reaches out to the consumer, immediately
25  you have to go through these prompts or these steps.

Page 38

1   You can't exempt from them.  You can hang up on it.
2   You could let your machine get it and listen to it.
3   However, if you stay on the line to get a live
4   operator, you have to go through these steps,
5   through these prompts.  It's one of the reasons why
6   SoundBite is used, that we have assurance that they
7   go through these prompts, that they get the mini
8   Miranda, that we've reached the correct person.
9      Q.   When you say you have assurance, what
10  is that?  Is that a promise or is that a contractual
11  agreement or what?
12      A.   It's what we are informed by
13  SoundBite.
14      Q.   In other words, you're told by
15  SoundBite that that's what they do?
16      A.   SoundBite is the external vendor.
17  That's what we purchased when we selected them.
18      Q.   Do you-all have -- at Resurgent do you
19  run audit reports on SoundBite to determine if
20  they're doing what they told you they were going to
21  do?
22      A.   There is some auditing done.  I'm not
23  sure of the specifics of the audits.
24      Q.   Do you have a recording of how this
25  plays out?

Page 39

1      A.   Of the script?
2      Q.   Yes.
3      A.   No, sir.
4      Q.   Have you asked for one?
5      A.   No, sir.
6      Q.   Okay.  Looking at Exhibit 11, just to
7   make sure I understand this, the call is made to the
8   number provided by Resurgent to SoundBite, correct?
9      A.   Yes.
10      Q.   And that's an automated call; is that
11  correct?
12      A.   Yes.
13      Q.   And then if you look at page 1, 1.1.1
14  introduction.  Is the first thing that assuming a
15  person answers, the first thing that would be heard
16  is this is Resurgent Capital Services calling in
17  reference to a dispute, and it would go through
18  those, I guess, three or four lines right there?
19      A.   Yes.
20      Q.   And so if somebody -- scratch that.
21      On the third line it says:  If this
22  is, and it would say the person's first and last
23  name, and they would press one, if that's their name
24  and they want to continue with the conversation --
25      A.   Yes.

Page 40

1      Q.   -- or I guess they don't -- it doesn't
2   have to be that person, just whoever answered could
3   press one; is that right?
4      A.   Certainly.
5      Q.   Okay.  And then where does it go after
6   that?
7      A.   Well, in the column below that, or the
8   box below it if they press one it goes right to the
9   Social Security verification which is on the next
10  page at 1.1.4.
11      Q.   Okay.  And then the person would have
12  to press the last four digits of their social
13  security number; is that correct, followed by the
14  pound sign?
15      A.   Yes.
16      Q.   Okay.  And then what happens?
17      A.   If they entered it correctly they'll
18  go to DC verified, which is on page 6.
19      Q.   And is that in the middle of the page,
20  1.1.7?
21      A.   Yes.
22      Q.   And that -- well, how do you know it's
23  not 1.1.8, or is that what happens after they get
24  the message?
25      A.   I'm sorry.  It happens after 1.1.7.

Page 41

1    Q.   Okay.  And that reads: This is
2  Resurgent Capital Services calling about your
3  dispute.  We would like to give you the opportunity
4  to resolve your account dispute with a customer
5  service representative.  For your reference this
6  communication is from a debt collector and is an
7  attempt to collect a debt.  Any information will be
8  used for that purpose.
9         Did I read that correctly?
10   A.   Yes, you did.
11   Q.   And then it goes to 1.1.8, correct?
12   A.   Yes, sir.
13   Q.   And then where does it go?
14   A.   Well, this is where -- let's see.
15 This is where the operator could come on if it
16 verified up to this point.  The remaining options
17 are if any other prompts or nonverification were
18 received.
19   Q.   Where does the step identified here
20 where the operator comes on or the -- whoever the
21 person is comes in?
22   A.   Okay.  In 1.1.8 DC verify, at the
23 prompt where it says, the called party here is
24 please continue to hold, that's where the agent
25 comes on.  Agent hears SoundBite.  That's the first

Page 42

1  reference to the agent coming on.  And they'll hear
2  the account number, and when they connect to the --
3  that's when they would connect to the agent.
4    Q.   And at that point does the -- does the
5  consumer's account pop up or populate the fields on
6  the agent's computer system?
7    A.   Yes.  And the agent hears it.
8    Q.   Does the agent have to manually enter
9  anything in such as the account number or does it
10 just automatically happen?
11   A.   It should automatically happen.
12   Q.   And you said the agent hears it.  What
13 did you mean by that?
14   A.   SoundBite also states it at the
15 beginning of the call for the agent to hear.
16   Q.   States what?
17   A.   The account number.
18   Q.   When does the recording at Resurgent
19 start, or when is it supposed to start?
20   A.   When the agency connects with the
21 consumer.
22   Q.   So should the recording say, SoundBite
23 and have the account number?
24   A.   I guess it should.  It could.
25   Q.   And then at that point once it's

Page 43

1  transferred to Resurgent, does the SoundBite part of
2  it, is that done?
3    A.   It's finished.
4    Q.   To your knowledge, has Resurgent ever
5  received complaints -- scratch that.
6         To your knowledge, are you aware of
7  whether there has ever been an issue with the mini
8  Miranda being played for the consumer?
9    A.   No.
10   Q.   Did you investigate as a part of your
11 preparation for this deposition or in looking into
12 this -- looking into this lawsuit, whether or not
13 that had ever been an issue?
14   A.   I investigated as to whether there
15 were any issues with SoundBite during March of 2012.
16   Q.   And what did you find?
17   A.   There were none.
18   Q.   And what did you do to investigate
19 that?
20   A.   Met with our business solutions
21 department and the account manager at SoundBite.
22   Q.   And what did you ask them?
23   A.   I specifically asked the account
24 manager at SoundBite if there are any maintenance
25 issues, any issues reported, any problems, any

Page 44

1  downtime for SoundBite during March of 2012.
2    Q.   And what did they tell you?
3    A.   He reported back that there were none.
4    Q.   Well, if a consumer -- let me change
5  that.
6         Ms. McIntyre Thompson -- for instance
7  Ms. McIntyre Thompson testified that she didn't hear
8  any mini Miranda.  Do you have any explanation for
9  how that could be?
10   A.   For how she couldn't hear the mini
11 Miranda?
12   Q.   Yes.
13   A.   No.  I have no explanation.
14   Q.   Other than what we have gone over do
15 you have any evidence to dispute her testimony that
16 she didn't hear the mini Miranda being played for
17 her?
18   A.   My testimony and investigation
19 resulted in that it can't be preempted.  You can't
20 choose an option that skips the mini Miranda.  The
21 mini Miranda is always given regardless of the other
22 options you choose and before you connect to a live
23 operator.
24   Q.   And that's assuming that system works
25 the way it's supposed to, correct?

Page 45

1    A.   Certainly.
2    Q.   Just so I'm clear, there's no
3  recording made of the actual mini Miranda being
4  played on any of these four calls?
5    A.   No.  There's no recordings through
6  SoundBite.
7    Q.   Okay.  If you'll look at Exhibit 8.
8  Going back to the categories of information, the
9  second column under four attempts found it says,
10  account.  Explain to me what that is.
11    A.   The account is Resurgent's, and it's
12  part of the dispute work flow.
13    Q.   And what would that account have been
14  in or what category would that account have been in
15  before it was in dispute?
16    A.   Before it was in dispute?  It was an
17  active account before Nationwide received a verbal
18  dispute.  And then a written dispute.
19    Q.   Is that what it's called, an active
20  account?
21    A.   Uh-huh.  Yes, sir.
22    Q.   And can you tell me what the other
23  categories are of accounts?
24    A.   All the categories or the ones that
25  apply to Ms. Thompson?

Page 46

1    Q.   The ones that apply to Ms. Thompson.
2    A.   There was a verbal dispute VDS
3  received by the collection agency in January 2012.
4  Then in February 14th, 2012, the collection agency
5  received a written dispute -- I'm sorry, Resurgent
6  received the written dispute.
7    Q.   Is that WDS?
8    A.   That's WDS.
9    Q.   So the account actually is at a
10  different category called WDS?
11    A.   Yes, sir.
12    Q.   Okay.  Any others?
13    A.   On April 3rd, 2012, it was placed into
14  AGC which is all general compliance.
15    Q.   And what does that category generally
16  denote?
17    A.   Compliance has received information,
18  in this particular case, that a lawsuit had been
19  filed.
20    Q.   What other account categories are
21  there other than the ones that you've identified?  I
22  mean are there hundreds of them, or just a few?
23    A.   No.  There's quite a bit.
24    Q.   If an account was being paid is there
25  a category for that?  In other words, if you entered

Page 47

1  into a payment plan with the consumer.
2    A.   There is a payment plan through -- we
3  have a settlement department that has a particular
4  payment plan, and then our agencies can put it into
5  a payment plan code for themselves.
6      There's also a payment plan for
7  garnishments on judgments.  So there are several
8  that would refer to payment plan.
9    Q.   Are there account categories that,
10  that denote whether a debt is out of statute?  If
11  you know what I mean.  Do you know what I mean by
12  that?
13    A.   I assume you're saying out of statute
14  of limitations legally?
15    Q.   Yes.
16    A.   There's not a status category, but
17  that information is provided in AMCS.
18    Q.   Are there certain rules that are
19  applied to those accounts in terms of how they are
20  collected that are different from accounts that are
21  within the statute of limitations?  In other words,
22  where if they don't pay Resurgent or PYOD or
23  somebody could sue on that account?
24      MR. MOORE:  Object to the form.  If
25  you understand it, go ahead and answer it.

Page 48

1      THE DEPONENT:  I don't.
2  BY MR. HERRING:
3    Q.   Well, I guess there's two ways to ask
4  that.  One is, are there certain rules in place that
5  implement procedures on how that account is
6  collected.  Like, for example, that would denote
7  which letters are going to be sent for that account
8  if it's past statute, or how many times you can
9  call, or just generally how the account is supposed
10  to be collected, or how the account will be
11  collected?
12      MR. MOORE:  Same objection, but keep
13  at it if you can.
14      THE DEPONENT:  I'm not aware of any
15  changes to collections other than it can't be with a
16  -- we wouldn't place it with a law firm because you
17  can't file suit.  Some accounts can be out of stat
18  but they're still collectible, but some states
19  change that, some don't.  So if they're not collect
20  -- if they're collectible but they're out of stat,
21  we wouldn't place them with a law firm, but we could
22  continue collecting.
23  BY MR. HERRING:
24    Q.   Do you know, and maybe this is a
25  better way to ask it, do you know if accounts that

1   are out of the statute of limitations have a
2   particular work flow or work flow rules that are in
3   place for those, like, for example, like we went
4   through the call flow rules, you know, if this
5   happens do this, if this happens then go to this
6   different message.
7           Do you know if there's certain work
8   flow rules that are in place for accounts that are
9   out of the statute of limitations?
10          MR. MOORE:  Object to the form.
11          THE DEPONENT:  I don't know of any
12  work flows that would be applicable to out of stat.
13  BY MR. HERRING:
14      Q.    If an account is out of the statute of
15  limitations, is that information noted within the
16  file notes or the account notes?
17      A.    It would be noted within -- yes,
18  within AMCS.
19      Q.    Okay.  And show me where that's noted
20  on this account.  And for the record you're looking
21  at Exhibit 7; is that correct?
22      A.    Yes.  Exhibit 7.  If you look on page
23  6 of 6, the middle column about halfway down has an
24  out-of-statute date.
25      Q.    Do you know if when that date is

1   entered if that causes any flags or anything to be
2   activated on an account?
3       A.    I don't know that it would cause any
4   flags.  However, when we're dealing with the account
5   when anyone in customer service, anyone at Resurgent
6   is dealing with the account, we are constantly
7   looking at all these screens for the information.
8   So anyone in customer service could see the
9   out-of-stat date at any time.
10      Q.    Do you know if that account data
11  category, the out-of-statute date, is that -- is
12  that a -- I'm trying to think of the right term, is
13  that a static data field or -- and I know we're
14  going to have to get on the same page.  And by that
15  I mean you just put that in or take it out, or is
16  that data field connected to the rest of the account
17  that when that date is an out-of-statute date it
18  prompts certain things to happen or to not happen?
19          MR. MOORE:  Object to form.
20  BY MR. HERRING:
21      Q.    Do you understand what I'm trying to
22  ask?
23      A.    I understand if it prompts.  I don't
24  think it prompts certain things.  However, when
25  Resurgent works the account, if I was working the

1   account this would be one of the first screens I
2   would look at to give me an overview of the
3   charge-off date, the current owner, the out-of-stat
4   date.
5       Q.    Are there certain letters that cannot
6   be sent to a consumer if their account is out of
7   statute?
8       A.    There could be.  We have some
9   jurisdictions that do not allow collectibility after
10  it's out of stat.
11      Q.    And is that something -- as to whether
12  or not that letter would be appropriate to be sent,
13  is that something that's determined manually by the
14  collector or is that something that the system
15  determines?
16      A.    The system would definitely throw up a
17  flag if you were trying to send a collection letter
18  in a jurisdiction where you could not receive a
19  collection letter.
20      Q.    And what do you mean by, throw up a
21  flag?
22      A.    There would be critical notes in the
23  system that would highlight and say, this
24  jurisdiction does not allow collectibility of an
25  out-of-statute debt.  At that point it would be upon

1   whoever was sending the letter and correspondence to
2   go back and confirm what the out-of-stat date was
3   for this particular account.  The out-of-stat date
4   itself would not throw up that flag.  It would just
5   be a jurisdictional note.
6       Q.    Where is credit reporting, whether or
7   not an account is being credit reported, listed in
8   these account notes?
9       A.    On page 5 of 6.  If there had been any
10  credit bureau reporting it would have been listed
11  here in its own table.
12      Q.    And where -- for the record where is
13  "here"?
14      A.    Under the first line says, borrower
15  bankruptcy.  And then under that table for
16  bankruptcy it says, no CBR last reported data found.
17          That's where the credit bureauing
18  table would be on this report if we'd ever reported.
19      Q.    And what is CBR history found?
20      A.    The table would actually show every
21  month, every year that it was reported.  On other
22  accounts we report automatically electronically
23  every month.  So there would be a running tabulation
24  of the actual date that the credit bureaus received
25  it.

Page 53

```
 1          Q.   And what are CBR stoppages?
 2          A.   If credit bureau reporting was ever
 3   stopped for any reason.
 4          Q.   Does it say in the collection notes
 5   here for any of them, is there a notation that would
 6   tell a collector that an account was not allowed to
 7   be reported or that Resurgent was not allowing the
 8   account to be reported or would not in the future?
 9          A.   Well, besides the out-of-stat date and
10   the no credit bureau heading had been started, those
11   two would indicate that we're not reporting.
12          Q.   I understand that.  But I guess what
13   I'm asking is, how would a collector know -- well,
14   let me ask it this way.
15               What training would a collector have
16   received in terms of whether or not an account could
17   be reported to a credit bureau?
18          MR. MOORE:  Are you talking about a
19   collector or someone in the dispute department?
20          MR. HERRING:  My question was the
21   collectors.
22          MR. MOORE:  Okay.
23          THE DEPONENT:  The collector would
24   have the same training, FDCPA training and FCRA
25   training, and then we would go through a basic
```

Page 54

```
 1   credit bureau training of, if it's out-of-stat or a
 2   stale debt we would never report it to the credit
 3   bureaus.  They should have that knowledge.
 4          MR. HERRING:  I'm looking for that
 5   training you-all produced, Neil.  Procedure manual.
 6          MR. MOORE:  The credit reporting
 7   thing?
 8          MR. HERRING:  I won't call it the
 9   manual.  It's a sliver of --
10          MR. MOORE:  Right.  A portion of the
11   manual.
12          MR. HERRING:  All right.  Here it is.
13   Exhibit 6 to your deposition.
14   BY MR. HERRING:
15          Q.   Is the portion of the manual that your
16   lawyer deemed applicable to this case, is the
17   training that you were referring to found in
18   Exhibit 6?
19          A.   Well, this is one of the policies they
20   would have reviewed in the training.
21          Q.   The actual training that a collector
22   would receive, is there a manual that they're
23   trained with?
24          A.   I'm not sure if they're trained by a
25   manual.
```

Page 55

```
 1          Q.   Have you ever participated in the
 2   training that collectors undergo before they can
 3   collect debt?
 4          A.   Not for collectors, no.
 5          Q.   All right.  What about for employees
 6   that handle disputes?
 7          A.   No.
 8          Q.   What training would an employee that
 9   handles disputes, and let me make sure we're on the
10   same page.  The employee that spoke to or that would
11   have spoken to Ms. Thompson would be in the dispute
12   department; is that correct?
13          A.   Yes.  It's inbound customer service.
14   But he works with dispute work flows.
15          Q.   Have you ever been a part of any of
16   the training that is provided to employees in the
17   inbound customer service department?
18          A.   Yes.
19          Q.   Okay.  And did any of that training
20   that you were a part of or observe, did that involve
21   credit reporting?
22          A.   It could have.  We train annually.  We
23   train as a company on the FDCPA, the FCRA, credit
24   bureau requirements, we train on those topics
25   annually.  And any given point in time I participate
```

Page 56

```
 1   with a group from every department.
 2          Q.   Aside from training that you
 3   participated in yourself, tell me what training
 4   you're aware of that inbound customer service
 5   employees receive in regards to how they're supposed
 6   to handle disputes from a consumer.
 7          A.   Well, besides those categories,
 8   they're given extensive training in the FDCPA and
 9   FCRA.  And then they're given training on the
10   dispute process and how the process works.  How it
11   goes through SoundBite.  How we record the calls.
12   They know that every call they have will be
13   recorded.
14               They're trained on AMCS, how to take
15   in notes.  They're trained on jurisdictional issues
16   that we have.
17          Q.   And how is this training done?  Is it
18   done by video?  Is it done with a PowerPoint
19   presentation?  Or is there a manual or what?
20          A.   It's really done by live discussions,
21   a live conference leader.  We have -- usually it's
22   all done live with testing at the end.
23          Q.   And are these tests kept in the
24   personnel files of the employees that take them?
25          A.   I'm not sure if they keep them or not.
```

Page 57

```
 1         Q.   So do you know if there is a manual
 2    that the employees are given as a part of their
 3    training?
 4              MR. MOORE:  Object to form.
 5              MR. HERRING:  And by the employees I
 6    mean the employees in the inbound customer service
 7    department.
 8              THE DEPONENT:  I'm not aware of any
 9    manual.
10    BY MR. HERRING:
11         Q.   What about when they're hired?
12         A.   I'm not aware of any manual.
13         Q.   What training does an inbound customer
14    service employee receive in regards to what they can
15    tell a consumer about a debt that is out of statute?
16         A.   While -- when we have our training
17    through the FDCPA and the FCRA, it's very clear that
18    if we can't do something, we can't threaten to do
19    something.  You can't say any action other than what
20    you can actually do.  The training through those two
21    categories is very extensive into how you speak to a
22    consumer, what you can say and what you can't say.
23    What kind of actions you can take.
24         Q.   And when you are talking about the
25    training, are you talking about the initial training
```

Page 58

```
 1    or are you talking about the yearly training?
 2         A.   It's all of it.
 3         Q.   Okay.  And I understand that the
 4    training is what?  You call it a live -- with a live
 5    conference leader?  Is that live conference leader
 6    in the room with the people being trained or are
 7    they at another site?
 8         A.   They're in the room.
 9         Q.   And do they have a PowerPoint that
10    they use?
11         A.   I guess sometimes they do and then
12    sometimes it's, here's -- my training was a copy of
13    the FDCPA, and we went through it what felt like
14    line item by line item.
15         Q.   And so there was no manual with that,
16    it was just a copy of the FDCPA?
17         A.   That's exactly how we trained through
18    it.
19         Q.   Okay.  Is this Exhibit 12 the
20    Resurgent Capital Services credit bureau reporting
21    policy, is that part of a larger policy and
22    procedure manual?
23         A.   No.
24         Q.   This is its own standalone policy?
25         A.   Yes.  Mine says Exhibit 6 but...
```

Page 59

```
 1         Q.   Yeah, it does.  I guess I marked it
 2    twice.
 3              MR. MOORE:  Let's go off while you're
 4    looking for that.
 5              (Off-the-record.)
 6              MR. HERRING:  Back on the record.  I
 7    think we cleared up, we're only supposed to have 11
 8    exhibits so far.  And the credit bureau reporting
 9    policy should be Exhibit 6.
10    BY MR. HERRING:
11         Q.   Was it your testimony that the inbound
12    customer service employees would be trained
13    regarding the credit bureau reporting policy?
14         A.   Yes.  They would receive training
15    through the FDCPA and FCRA.
16         Q.   Are inbound customer service employees
17    provided with this credit bureau reporting policy
18    marked as Exhibit 6 with the actual policy itself?
19         A.   I'm not sure about that.
20         Q.   Tell me what their training would be
21    in regards to credit bureau reporting on accounts.
22         A.   Well, our credit bureau team actually
23    does the reporting.  They have more training and
24    more in-depth about the guidelines.  And so
25    therefore they do all our reporting.  But inbound
```

Page 60

```
 1    and collections would have training on the FCRA,
 2    which would take them through everything we're
 3    allowed to do or not allowed to do.
 4         Q.   And how do you know that?
 5         A.   Because that's what Resurgent does, it
 6    requires.
 7         Q.   Have you received that training
 8    yourself?
 9         A.   Yes, sir.
10         Q.   And, again, there's no document you're
11    aware of that is a part of that training; is that
12    correct?
13         A.   Not that I'm aware of.
14         Q.   Did you look to see if there was one?
15         A.   No, sir.
16         Q.   If you'll look at page 2 of this
17    exhibit.
18              MR. MOORE:  She doesn't have it.
19    BY MR. HERRING:
20         Q.   Exhibit 6.
21         A.   Okay.
22         Q.   At the top it says under purpose:  It
23    is the intention of this policy to adhere to the
24    Fair Credit Reporting Act --
25              And we're on page 3 of 5.  I'm sorry.
```

Page 61

1    Are you with me?
2         A.   Yes.
3         Q.   It is the intention of this policy to
4    adhere to the Fair Credit Reporting Act and the Fair
5    and Accurate Credit Transaction Act as well as the
6    Resurgent policy document credit reporting dash
7    accuracy and integrity of credit reporting.
8              MR. MOORE:  Accuracy and integrity of
9    reporting policy?
10   BY MR. HERRING:
11        Q.   I'm sorry.  I read a different part.
12   Accuracy and integrity of reporting policy.  Is that
13   a different, that last document, is that different
14   than what we have here?
15        A.   I don't know.
16        Q.   Do you know what the training is
17   for -- scratch that.
18             Do you know what Resurgent's policy
19   and procedure is in regards to when an account can
20   and cannot be credit reported?
21             MR. MOORE:  Object to form.
22             THE DEPONENT:  I wouldn't know all the
23   policies.  I know we comply with the FCRA.
24   BY MR. HERRING:
25        Q.   How do you know that?

Page 62

1         A.   Because it's required.
2         Q.   Required by who?
3         A.   By Resurgent.  We have strict policies
4    that follow the guidelines.
5         Q.   And those policies are followed every
6    time, correct?
7         A.   To the best of my knowledge.
8         Q.   Do you know what Resurgent's policy
9    and procedure is in regards to what an employee in
10   the inbound customer service department can tell a
11   consumer about credit reporting?
12        A.   Yes.
13        Q.   And what is that policy and procedure?
14        A.   Well, there are several policies and
15   procedures.
16        Q.   Okay.  Well, what are they called?
17        A.   You follow the FCRA.  You can't lie to
18   the consumer.  You can't threaten to do something
19   that you're not capable or able of doing.  You can't
20   misrepresent the debt.
21        Q.   Okay.  Now, those are all FDCPA
22   policies, correct?
23        A.   Uh-huh.  That we incorporate.
24        Q.   Is there any written policy or
25   procedure at Resurgent that tells any of the

Page 63

1    customer -- the employees in the inbound customer
2    service department whether a debt that is outside
3    the statute of limitations can be credit reported?
4         A.   A written policy --
5         Q.   Or procedure.
6         A.   -- or procedure?  I'm not aware of
7    any.  I can double-check that information.
8         Q.   Well, you knew before you came in here
9    that that was one of the issues in this case,
10   correct?
11        A.   Yes, I did.
12        Q.   Did you undertake to find out if such
13   a policy or procedure existed before you came in
14   here today?
15        A.   I did not undertake to ask if such a
16   policy or procedure was written.
17        Q.   Well, aside from asking, did you make
18   any effort in any way to find out if there was a
19   written policy and procedure?
20        A.   Not if there was a written one, no.
21        Q.   What about the training that the
22   inbound customer service employees receive in
23   regards to whether or not an account that is outside
24   the statute of limitations can be credit reported?
25             MR. MOORE:  Object to form.

Page 64

1              THE DEPONENT:  What kind of training
2    would you be talking about?
3    BY MR. HERRING:
4         Q.   I'm talking about any training that
5    they receive, whether it's new hire training or
6    update, where they're being trained on when they
7    interact with the -- with a consumer, is there any
8    kind of training that tells them -- well, first of
9    all is there any kind of training that trains them
10   on whether or not an account that's outside of the
11   statute of limitation can be credit reported?
12        A.   Yes.  Training through the FCRA and
13   the FDCPA.
14        Q.   Can you point me to any specific
15   training other than just saying, it's something we
16   train on the FCRA?  Can you point me to the training
17   that happened in 2011, or can you point me to a
18   slide show, or a manual, or any handout, or anything
19   like that that is a part of the training that
20   documents that those employees were trained on that
21   credit reporting?
22             MR. MOORE:  Object to form.
23             THE DEPONENT:  You know, I don't
24   believe so in that when I went into training in the
25   room full of many other people, many other

Page 65

```
 1   departments, I was handed an FDCPA guide and a FCRA
 2   guide. And it said, let's start, let me explain how
 3   this works. And you go through everything. Whether
 4   a department has a specific PowerPoint, there could
 5   be something that they have created specifically for
 6   their department that I'm not aware of.
 7   BY MR. HERRING:
 8       Q.   Did you undertake to see if there are
 9   any policy and procedure manuals, or training
10   manuals, or handouts, or documents, or whatever
11   format that's provided to the inbound customer
12   service employees as a part of their training?
13       A.   I undertook to meet with that
14   department and to find out exactly what information
15   that they had for the phone call. We went through
16   everything. I didn't specifically say hand over
17   anything you have in writing.
18       Q.   Let me go back to one thing you said.
19   You said you were handed a FDCPA guide and an FCRA
20   guide. Just so I'm clear, were you handed an actual
21   copy of the FDCPA or were you handed something that
22   was a summary or an outline on what you were being
23   taught about the FDCPA?
24       A.   Unfortunately it was the actual FDCPA.
25       Q.   What about the FCRA?
```

Page 66

```
 1       A.   It was the same.
 2       Q.   And do you know what part of the FCRA
 3   addresses whether an account that is beyond a
 4   certain age or out of the statute of limitations of
 5   whether or not that account can be reported?
 6       A.   No. I couldn't cite that from memory.
 7       Q.   Do you recall whether as a part of --
 8   well, scratch that.
 9            Did you receive the same training as
10   the employees in the dispute department in regards
11   to the FCRA?
12       A.   I believe so.
13       Q.   And do you recall whether the FCRA
14   addresses the reporting of accounts, credit card
15   accounts or accounts that are outside of the statute
16   of limitations?
17       A.   I can't recall if they distinguish
18   whether they're outside of the legal statute of
19   limitations or if they refer to them as the stale
20   debt that we wouldn't report after seven years or
21   ten years depending on the bureau.
22       Q.   Which bureau reports debts up to ten
23   years?
24       A.   I don't know anymore.
25       Q.   Looking at Exhibit 6, will you point
```

Page 67

```
 1   me to the part of the policy that addresses credit
 2   reporting of accounts that are beyond a certain age
 3   or stale accounts as you call them?
 4       A.   I don't believe it's in this policy.
 5   We refer to the FCRA for that.
 6       Q.   Have you looked through the entire
 7   policy?
 8       A.   Yes.
 9       Q.   Did you find anything in the policy
10   that was responsive to my question?
11       A.   No.
12       Q.   If you look on page 4 of 5, I think at
13   the top right is where the paging is, the page
14   numbers are. Do you see Section 7.06, closed
15   accounts?
16       A.   Yes.
17       Q.   What does that mean?
18       A.   Accounts that we close.
19       Q.   Okay. That's not an account --
20       A.   Resurgent.
21       Q.   I'm sorry.
22       A.   I'm sorry. As Resurgent.
23       Q.   That's not accounts that have been
24   closed by the original creditor; is that correct?
25       A.   That's correct.
```

Page 68

```
 1       Q.   Is there a policy and procedure at
 2   Resurgent for the employees handling disputes in
 3   regards to what they can tell a consumer about a
 4   debt and whether or not they're responsible for that
 5   debt, for a debt that's outside the statute of
 6   limitations?
 7            MR. MOORE: Object to form.
 8   BY MR. HERRING:
 9       Q.   Do you understand what I'm asking?
10       A.   No. I'm sorry.
11       Q.   All right. We'll go back a little
12   bit. For a debt that's outside the statute of
13   limitations, an employee within the dispute
14   department cannot tell the consumer that we'll sue
15   you on that debt --
16       A.   Correct.
17       Q.   -- if you don't pay it; is that
18   correct?
19       A.   That's correct.
20       Q.   Is there a policy and procedure that
21   spells that out in writing?
22       A.   Not that I'm aware of.
23       Q.   Okay. And an employee within the dispute
24   department, and just so we're clear by dispute
25   department, I mean the same as the inbound. I
```

Page 69

1    forget the actual name of it.  The inbound customer
2    service department, is that -- can we treat those as
3    synonymous?
4         A.   Yes.
5         Q.   Or is there a distinction?
6         A.   No.
7         Q.   Is there a policy and procedure other
8    than just the FCRA, that tells those employees what
9    they can tell a customer or what they cannot tell a
10   customer about whether they're going to credit
11   report an account that is past the statute of
12   limitations?
13        A.   Are you asking if there's a written
14   policy and procedure?
15        Q.   Yes.  Is there a written policy and
16   procedure?
17        A.   Not that I'm aware of.
18        Q.   Is there an oral policy and procedure?
19        A.   Certainly.
20        Q.   And that oral policy and procedure is
21   that an employee in the dispute department can never
22   tell a consumer that they're going to credit report
23   an account that is past the statute of limitations,
24   correct?
25        A.   Correct.

Page 70

1         Q.   And that policy and procedure, the
2    oral one, is also they can never tell a customer
3    that they're going to report an account that is more
4    than seven years old?
5         A.   Correct.
6         Q.   Is there a talk-off or a script that
7    is provided to those employees in the dispute
8    department in regards to how they're supposed to
9    handle those calls?  And by those I just mean any
10   call involving a dispute with a consumer.
11        A.   I'm not sure if there's a script.
12        Q.   Is there a talk-off?
13        A.   I'm sorry, I don't know what that
14   means.
15        Q.   Okay.  Have you heard of that term
16   before?
17        A.   No.
18        Q.   I think it's just a fancy term for a
19   script, but I've seen some debt collection companies
20   call it a talk-off.  Some call it a script.
21             Can an employee in the dispute
22   department ever tell a consumer that they're
23   required to pay a debt that is beyond the statute of
24   limitations?
25             MR. MOORE:  Object to form.

Page 71

1             THE DEPONENT:  What would I guess
2    required mean?
3    BY MR. HERRING:
4         Q.   Can they use that word?
5         A.   I'm not sure if it's a banned word,
6    but they could certainly tell them the account is
7    still collectible even though it can't be sued on.
8         Q.   And are there a list of banned words?
9    Yeah.  I know that there is a list.  Is there a
10   banned words list that employees in the dispute
11   department are provided with that they cannot use
12   with consumers?
13        A.   No.  I don't believe so.
14        Q.   Okay.  What did you mean by a banned
15   word?
16        A.   Well, it was just the way you said,
17   can they use the word required.  I was like, I don't
18   think they can or can't.  I would hesitate to use
19   the word "required."  I would say it was still
20   collectible.
21        Q.   Can an employee in the dispute
22   department in dealing with a consumer give a
23   consumer the impression that the law requires them
24   to pay this debt even though it's beyond the statute
25   of limitations?

Page 72

1             MR. MOORE:  Object to the form of that
2    question too.
3             THE DEPONENT:  Well, I wouldn't
4    understand that the law requires them to.  What the
5    collection person can tell them is that the debt is
6    still collectible.  The debt is out of stat.  It
7    can't be sued upon, but it is still a collectible
8    debt.
9         Q.   Okay.  Can a collector in the dispute
10   department imply that they can still sue a consumer
11   on a debt that's outside the statute of limitations?
12             MR. MOORE:  Same.
13             THE DEPONENT:  No.
14   BY MR. HERRING:
15        Q.   And the same thing for credit
16   reporting the debt.  In other words, can they imply
17   that they're going to credit report it even though
18   they may not use those exact words?
19             MR. MOORE:  Same objections.
20             THE DEPONENT:  The collector couldn't
21   imply or state that we were going to report if the
22   debt was stale.
23   BY MR. HERRING:
24        Q.   Can a collector in the dispute
25   department tell a consumer that they're still

## Page 73

```
1    responsible for this debt even though it's outside
2    the statute of limitations?
3            MR. MOORE: Same objection.
4            THE DEPONENT: I think the collector
5    in all truthfulness can say this debt is outside the
6    statute of limitations.  However, it is still a
7    valid debt.  It is still collectible.
8    BY MR. HERRING:
9        Q.   Do you believe there's any requirement
10   for that same collector to tell the consumer that
11   they can't be sued on that debt?
12           MR. MOORE: Same objections.
13           THE DEPONENT: Is there a requirement
14   to explain what out of stat means?  Is that the
15   question?
16   BY MR. HERRING:
17       Q.   Sure.
18       A.   I'm not sure there is a requirement to
19   explain it.
20       Q.   Do you know if collectors within the
21   dispute department are trained to tell a consumer
22   that a debt that's out of statute means that they
23   can't be sued on it?
24       A.   I don't know.
25       Q.   Do you know if they're trained not to
```

## Page 74

```
1    tell them that?
2        A.   No.
3        Q.   Do you know if they're trained not to
4    volunteer it?
5        A.   I do not believe they would be trained
6    to not volunteer it.  But I do not know.
7            MR. HERRING: There's a lot of
8    negatives.
9            MR. MOORE: That was your question.
10           MR. HERRING: That was my question,
11   but that was her answer.
12   BY MR. HERRING:
13       Q.   Well, explain to me what you're
14   saying?  Do you think they are trained to not
15   volunteer it?  Do you understand what I'm asking?
16       A.   I believe so.  Would they not
17   volunteer it on purpose, trained to not volunteer it
18   on purpose.
19       Q.   Sure.
20       A.   And my response would be, no.
21       Q.   The collector who spoke with
22   Ms. Thompson on this account would have been trained
23   that this account or that accounts that are more
24   than seven years old past default cannot be credit
25   reported; is that correct?
```

## Page 75

```
1        A.   He would have been trained and he
2    would know that this account is out of stat, and
3    wasn't -- and couldn't be reported to the credit
4    bureau.
5        Q.   And just I think the record is
6    probably clear, but by out of stat you mean out of
7    the statute of limitations?
8        A.   Yes.
9        Q.   And by that you mean they can't be
10   sued on that account because it's beyond the statute
11   of limitations; is that correct?
12       A.   Yes.
13       Q.   In March of 2012, Resurgent's website
14   said:  We are committed to treating all consumers
15   with respect, fairness and honesty.
16           Are those standards that Resurgent
17   expects all of its collectors regardless of the
18   department to live up to?
19       A.   Yes.
20       Q.   And is that still on your website,
21   that statement, or do you know?
22       A.   I haven't looked at the website in a
23   very long time.  So I don't know.
24           MR. HERRING: Tell you what.  Let's
25   take a break.
```

## Page 76

```
1            MR. MOORE: Sure.
2            (A recess transpired.)
3    BY MR. HERRING:
4        Q.   Back on the record after a lunch
5    break.
6            I want to hand you a document that was
7    produced to us by your lawyer.  And it doesn't
8    appear to me to be a part of this file.  And at
9    least that doesn't look like Ms. Thompson's
10   signature.  Do you know if that is connected with
11   this file?
12       A.   It is a part of our file records.
13       Q.   For Ms. Thompson's file?
14       A.   Yes, sir.  But I don't see anything on
15   it that identifies.  I can't make out the
16   handwriting.
17       Q.   I'm not going to attach that, and just
18   for the record it's a letter dated January 23rd,
19   2012, addressed to whom it may concern, and then the
20   signature is illegible.
21           (PLF. EXH. 12, State of Alabama - June 2, 2005 Letter
22   from Nancy L. Worley, Secretary of State , was marked
23   for identification.)
24   BY MR. HERRING:
25       Q.   I'm handing you Exhibit 12 to your
```

Page 77

1    deposition, which are Bates stamped 30, 31 and 32.
2    And they appear to be state filings with the State
3    of Alabama, at least the first two pages on behalf
4    of an entity named, is it Alegis?
5        A.   Yes.
6        Q.   Who is Alegis Group, LP?
7        A.   Alegis Group, LP was the former --
8    former name of Resurgent Capital Services.
9        Q.   And so then the third page is a
10   document filed in June -- on June 1, 2005, which is
11   a certificate of correction changing the name to
12   Resurgent Capital Services, LP; is that correct?
13       A.   Yes, it is.
14       Q.   And Resurgent Capital Services as
15   denoted on the letterhead in some of these letters,
16   that's the same entity as Resurgent Capital
17   Services, LP; is that correct?
18       A.   Yes.
19   (PLF. EXH. 13, Performance Coaching Form, was marked
20   for identification.)
21   BY MR. HERRING:
22       Q.   I'm handing you Exhibit 13 to your
23   deposition.  Will you identify that for the record?
24       A.   These are documents from the employee
25   file of Aaron Dargis.

Page 78

1    (PLF. EXH. 14, Email Set. 30, 2011 with attached
2    documents, was marked for identification.)
3    BY MR. HERRING:
4        Q.   And Exhibit 14 to your deposition.
5        Will you identify that?
6        A.   Additional documents from the
7    employment file of Aaron Dargis.
8        Q.   If you'll turn to Bates 128 in
9    Exhibit 13.  Are you there?
10       A.   Uh-huh.
11       Q.   It looks like on this page and 129,
12   and 130 there was an event a few months after the
13   facts, the basis of this lawsuit involving Aaron
14   Dargis, where it was reported that he smelled like
15   alcohol.
16           Other than this event, do you know if
17   there were any other instances where he was turned
18   in or disciplined, or the issue of whether he had
19   been drinking on the job ever came up?
20       A.   No.  Just this instance.
21       Q.   And on page 128 there's a note that
22   says:  Around 3:30 I witnessed Aaron being very
23   sociable and laughing out loud very jolly.  During
24   this time I noticed Aaron's chair was slid over near
25   another CSR.

Page 79

1        What does CSR stand for?
2        A.   Customer service representative.
3        Q.   Natalie Gutierrez -- did I pronounce
4    that right?
5        A.   That's how I would pronounce it.
6        Q.   And he was holding a conversation with
7    her.
8            And then on the next page there's
9    another email that said:  I witnessed Aaron being
10   very jovial and social like yesterday afternoon,
11   which is very out of character for him.
12           Now, do you know when Aaron was
13   terminated?
14       A.   In September, 2012.
15       Q.   Okay.  Did you know him or meet him
16   before he was terminated?
17       A.   No.
18       Q.   Do you know generally if his character
19   was not to be jovial and social, or difficult to get
20   along with?
21       A.   No.  To my knowledge I never met
22   Aaron.
23       Q.   Do you know of any complaints other
24   than this one against him for how he handled any
25   collection calls or dispute calls?

Page 80

1        A.   No.  There were no complaints other
2    than what's in his file.
3        Q.   Okay.  And as I understand it, he was
4    terminated for tardiness?
5        A.   Yes.
6        Q.   If you'll look on page 134.  Do you
7    see the pictures?
8        A.   Yes.
9        Q.   Is that -- I assume that's Aaron
10   Dargis?
11       A.   Yes.
12       Q.   Do you know where he is now?
13       A.   No, sir.
14       Q.   Do you know if any disciplinary
15   actions were taken against him for anything related
16   to his collection or his activities on
17   Ms. Thompson's account?
18       A.   No.  There were not.
19       Q.   Do you know if anybody interviewed
20   Mr. Dargis in relation to any of the things he did
21   on this account?
22       A.   No.  I don't know.
23       Q.   Do you know if anybody spoke with him
24   in regards to this account?
25       A.   I don't know.

Page 81

1      Q.   If Mr. Dargis had given a statement in
2   regards to this account, where would that statement
3   be? I mean, where would it be kept?
4      A.   Any statements he would have given
5   would have been kept in his personnel file.
6      Q.   Do you know if as a part of the
7   investigation into this if anybody spoke with him,
8   contacted him, interviewed him or questioned him in
9   any way about what happened?
10     A.   I don't know.
11     Q.   Is there somebody at Resurgent who
12   would know that better than you would?
13     A.   His supervisor at the time before he
14   was terminated. That would be who I would go to to
15   find out. Or Michael Bonner in our office who is
16   our litigation counsel.
17     Q.   I've heard of him. Do you know if the
18   supervisor -- well, scratch that.
19          Who was Mr. Dargis' supervisor at the
20   time of this event in March of 2012?
21     A.   Steve Torres.
22     Q.   Do you know if Mr. Torres has been
23   interviewed or contacted as a part of any
24   investigation in regards to this account?
25     A.   I don't know.

Page 82

1      Q.   Do you know if there is any
2   documentation in Mr. Dargis' file that would show
3   the training he received in regards to the FCRA or
4   the FDCPA as a part of his employment with
5   Resurgent?
6      A.   I reviewed his file, but there's a lot
7   of documents, so I can't recall.
8      Q.   If there were any documents associated
9   with his training -- well, let me ask it this way.
10          If there were any policy or procedure
11   manuals or documents provided to Mr. Dargis as a
12   part of his training or just as a part of his job
13   duties, would those be in his personnel file?
14          MR. MOORE: Asked and answered. Go
15   ahead.
16          MR. HERRING: What did you say, Neil?
17          MR. MOORE: It's been asked and
18   answered, but go ahead.
19          MR. HERRING: I couldn't understand
20   you.
21          MR. MOORE: Sorry. I'll take my
22   toothpick out next time.
23          MR. HERRING: All right.
24          THE DEPONENT: I don't know.
25   BY MR. HERRING:

Page 83

1      Q.   Are there documents that would
2   constitute or incorporate policy and procedures
3   regarding collecting debt that employees such as
4   Mr. Dargis are required to keep at their desk or to
5   keep in a way that they can refer to them if they
6   need to?
7      A.   I'm not sure if Mr. Dargis would have
8   been required. Many of us keep a copy of the FDCPA,
9   FCRA, right there on our desk.
10     Q.   And as a part of the training they're
11   required to read the FDCPA, correct?
12     A.   Yes.
13     Q.   And the FCRA? Do you know if the
14   people in Mr. Dargis' department were required to
15   read the FCRA?
16     A.   I'm not positive -- I'm not sure if
17   they had to read it in its entirety or if it's just
18   certain sections for certain departments.
19     Q.   As a part of your training have you
20   had to read the FCRA in its entirety?
21     A.   Yes.
22     Q.   All 300 something pages of it or
23   however long it is?
24     A.   Yes. But don't ask for specific cites
25   or...

Page 84

1      Q.   If you'll turn to page 138 of
2   Exhibit 13. What -- can you tell me what that
3   document -- and the document on the next page which
4   appears to be the same kind of memorandum. Just one
5   is dated May the 11th, 2012, and the other is
6   July 3rd, 2012. But can you tell me what it is
7   attempting to address or what that talks about?
8      A.   Certainly it's -- they're both
9   performance coaching forms that are given out when
10   there's an issue or a problem with an employee that
11   needs to be discussed with them.
12          The one on July 3rd, 2012, discusses
13   that Mr. Dargis had not maintained a 93-percent
14   average in quality and 9.5 calls per hour to be in
15   good standing. He ended up with a monthly average
16   of 91.88, below what was required. And on May 11th,
17   2012, Mr. Dargis was required to have a 93-percent
18   average in quality, and 9.5 calls per hour to be in
19   good standing. And they note that it was the third
20   consecutive month that he had not met the standard
21   of quality. He wasn't meeting his monthly goals in
22   calls.
23     Q.   Okay. Well, what exactly does quality
24   mean?
25     A.   Quality has to do with amount of calls

Page 85

```
1    you're receiving.
2         Q.   How is that not quantity?
3         A.   I'm not sure.  The average is set for
4    in quality, and so many calls per hour to be in good
5    standing.  And that's calls that you respond to and
6    work.
7         Q.   Okay.  Well, looking at the July 3rd
8    document where it says, previous discussions
9    April 3, 2012, final of three consecutive months'
10   performance coaching, what is that?
11        A.   I'm sorry.  Where are you looking at
12   again?  Which page number?
13             Oh, thank you.
14        Q.   Where it says, final of three
15   consecutive months performance coaching; so does
16   that mean on April 3rd, that was the last month of
17   three consecutive months where he was receiving
18   performance coaching?
19        A.   I don't know.
20        Q.   Do you have any idea what that means?
21        A.   No.  I would only be guessing.
22        Q.   Do you know if there -- if it's
23   documented anywhere else in his file what the
24   performance coaching involved?
25        A.   No.  The performance coaching form
```

Page 86

```
1    would be the only thing.
2         Q.   And is that what we're looking at?
3         A.   Yes, sir.
4         Q.   Okay.  When it says final of three
5    consecutive months, does that mean in March and
6    February he was receiving coaching?
7         A.   I don't know what it means there.
8         Q.   And you don't know what the coaching
9    was for?
10             MR. MOORE:  Object to form.
11             THE DEPONENT:  Any coaching would be
12   documented such as this is.  That it had to do with
13   his performance ratings and how many calls he was
14   handling per hour.
15        Q.   So you're assuming that the three
16   consecutive coaching -- the issues for the coaching
17   sessions involved or centered around this quality
18   and quantity of calls per hour issue; is that
19   correct?
20             MR. MOORE:  Object to the form and use
21   of the word assuming.
22   BY MR. HERRING:
23        Q.   Well, your conclusion is, is that what
24   it was about?
25        A.   If I had to guess that would be my
```

Page 87

```
1    conclusion.
2         Q.   And on the July 3rd, letter where the
3    date is May 12th -- May 11th, 2012, discussion
4    91.88 percent, what does that mean?  What is that
5    measuring?
6         A.   I don't know.
7         Q.   And down below the company policy on
8    this subject, is that he must maintain a 93-percent
9    average in quality.  Do you know what the 93 percent
10   means?  I mean, when they say average in quality,
11   quality in what, in the words that you use, the
12   amount of money you collect?
13        A.   I don't know how they're averaging
14   quality besides the 9.5 calls per hour to be in good
15   standing.
16        Q.   So do you think he made 93 percent of
17   9.5 calls per hour, is that -- I mean, I'm just
18   trying to figure out what this is.
19        A.   Yes.  That's how I read it.  Is that
20   he wasn't pulling his weight with how many calls he
21   was working and responding to.
22        Q.   Do you know where the company policy
23   that sets the 93-percent average and 9.5 calls per
24   hour, have you seen that company policy?
25        A.   No, I have not.
```

Page 88

```
1         Q.   Have you seen a manual or a policy and
2    procedure manual or a training manual that you
3    believe would contain that policy?
4         A.   No, sir.
5         Q.   Do you know what the collection goals
6    for Mr. Dargis were in January, February and March
7    of 2012?
8              MR. MOORE:  Object to form.
9    BY MR. HERRING:
10        Q.   In terms of dollars.
11             MR. MOORE:  Same objection.
12             THE DEPONENT:  No, sir.
13   BY MR. HERRING:
14        Q.   If you wanted to find that out, how
15   would you do that?
16        A.   Well, I'm not positive that they
17   exist.  Mr. Dargis was an inbound customer service
18   scheduled to work on dispute work flows, to
19   investigate disputes.  It could happen that a
20   consumer would want to give him money, want to pay
21   it and resolve it.  But I'm not sure that would be
22   expected on a dispute investigative team.
23        Q.   If you wanted to figure that out, how
24   would you do that?
25        A.   I would check with inbound customer
```

Page 89

1    service.
2        Q.   Who's the person that you would call?
3        A.   Probably Steve Torres.
4        Q.   Do you know if Mr. Dargis is --
5    Mr. Dargis had ever had a debt collection license
6    revoked or suspended?
7        A.   No.  Not that I'm aware of.
8        Q.   If you'll turn on Exhibit 14 to page
9    82.
10       A.   Okay.
11       Q.   This appears to be the welcome letter
12   that Mr. Dargis was sent, and under compensation it
13   says that he'll be paid at the rate of $13 an hour
14   plus it also says you will also have the opportunity
15   to receive a monthly commission in addition to
16   hourly rate based off of performance.
17             Do you know how that monthly
18   commission would have been -- well, scratch that.
19             Do you know what performance issues
20   would be considered in coming up with that monthly
21   commission?
22       A.   No, I don't.
23       Q.   If he was entitled to it?
24       A.   I don't know.
25             MR. HERRING:  I forgot to give you

Page 90

1    yours, Neil.
2            MR. MOORE:  I wasn't going to
3    complain.  You've been doing a good job of funneling
4    me documents all day.
5            MR. HERRING:  You get to carry that
6    one back to Birmingham with you.
7    BY MR. HERRING:
8        Q.   In addition to recording calls for the
9    employees in the dispute department, what other
10   efforts are made by Resurgent to supervise those
11   employees and watch over those employees?
12           MR. MOORE:  Object to form.
13           THE DEPONENT:  Which employees?
14   BY MR. HERRING:
15       Q.   The ones in the dispute department.
16       A.   Dispute department.  Well, they have a
17   supervisor that is there on the floor with them.  We
18   also audit some of the telephonic recordings.  And
19   then all telephonic recordings when the connection
20   is made through SoundBite into our phone system and
21   they reach a live operator, it is recorded at that
22   point.
23       Q.   Can you tell -- I'm sorry.  Go ahead.
24       A.   I was going to say, so we always have
25   that to go back to.

Page 91

1        Q.   If any of Mr. Dargis' calls had been
2    audited, would that fact have shown up in his
3    personnel file?
4        A.   I don't think it would show up in a
5    personnel file.
6        Q.   Unless there was something wrong and
7    they were disciplined?
8        A.   Exactly.
9        Q.   Is there a way to go back and figure
10   out if any of his calls were audited?
11       A.   It would be a question I'd have to ask
12   our IT and audit teams.
13       Q.   Explain to me if you could, and tell
14   me if it would be easier to draw it we can do that,
15   the layout of the work area for the dispute
16   department.
17           MR. MOORE:  Stan, I know you're going
18   to get mad, but you want now or 2012?
19           MR. HERRING:  Well, 2012.
20   BY MR. HERRING:
21       Q.   If you know.  If you don't know...
22           MR. MOORE:  Tell him why that's hard.
23           THE DEPONENT:  Well, it is hard.  We
24   moved offices over February and March of this year
25   to take the seven -- almost seven floors in another

Page 92

1    building.  So it's a little hard.  But some of the
2    things have remained constant.  We work in cubicles,
3    and they're low-standing cubicles so that I could
4    see the person beside of me probably from shoulders
5    up.  I could have conversations with them.  It's a
6    very open area.  You could have conversations -- you
7    could listen to conversations being heard around
8    you.  And that part it is the same for dispute work
9    flow as it is up on the floor with the legal
10   department.
11   BY MR. HERRING:
12       Q.   And are the cubicles, how are they
13   laid out?  I mean, is there like a center and
14   they're -- not a center, but just kind of explain to
15   me are there like six in a row or is there space
16   between them or what?
17       A.   It's more like a maze, but there will
18   be a section of six to eight or ten, and then
19   there's space to walk through for the hallways.  And
20   then there's another section of maybe six or seven
21   or eight.
22       Q.   And in 2012 did you ever go into the
23   area where the cubicles were for the dispute
24   department?
25       A.   I'm sure I did, but...

Page 93

```
 1        Q.  Do they all kind of look the same?
 2        A.  They do.
 3        Q.  All right.  And regardless of the
 4   department, do they all have the low, I forget how
 5   you described it, but they're open; is that correct?
 6        A.  Yes, they're open.
 7        Q.  And the wall between -- not wall, but
 8   whatever it's called, the barrier between the two
 9   cubicles is low?
10        A.  Yes.  Every now and then you might run
11   into a manager that got lucky enough to get one tall
12   wall, but the other walls would be low.
13        Q.  Okay.  Do you happen to know or have
14   the seating chart for the cubicle area at the time
15   this account was being collected and where
16   Mr. Dargis sat on that seating chart?
17        A.  No.
18        Q.  Do you know or have any idea how far
19   he sat from the supervisor?
20        A.  I do not.
21        Q.  Would there be any way to determine
22   that or records kept of that?
23        A.  I'm not sure if they kept any records.
24   I could certainly check.
25        Q.  Could a manager or supervisor listen
```

Page 94

```
 1   in to, in 2012, listen in to the calls that the
 2   dispute employees, or the employees in the dispute
 3   department were handling at the time the call was
 4   going on?
 5        A.  You mean besides just listening to one
 6   side hearing him, hearing both sides?
 7        Q.  Yeah.  In other words, could he plug
 8   into the system and I guess with head phones or
 9   whatever just hear both sides at the time the call
10   is going on?
11        A.  I don't know if they could.
12        Q.  Okay.  I'd like to turn to the account
13   notes.  I think those are -- we marked them as
14   Exhibit 7, 8, 9 and 10.  Is that --
15        A.  Yes.
16        Q.  Is that all of them?
17        A.  I believe so.
18        Q.  If you'll look at Exhibit 8 for a
19   second.  Are these notes here a part of Resurgent's
20   system or a part of SoundBite's system?
21        A.  SoundBite.
22        Q.  Are you personally aware of how
23   SoundBite keeps their records?
24        A.  Define personally aware.
25        Q.  Well, are you familiar with their
```

Page 95

```
 1   recordkeeping and how they keep records, how they
 2   document calls, what they do to maintain the
 3   accuracy of them, that kind of thing?
 4        A.  As an external vendor I spoke with the
 5   account manager.  He helped to explain this data
 6   sheet to me after I had logged in and pulled it up.
 7   And we spoke in general terms about were there any
 8   maintenance issues during this time period, did they
 9   back up.  I'm not even sure if we spoke about backup
10   actually.  I think that's more internally on our
11   system for our recording but not for SoundBite.  But
12   he confirmed that there were no issues during that
13   time.  These were the only calls to that number.
14   And what the delivered by person delivered by
15   machine meant.
16        Q.  I'm not -- I understand what you're
17   saying, and that's the information he told you about
18   their system.  But as I understand your answer,
19   you're not personally aware what your account
20   keeping practices and policies and how they keep
21   records; is that correct?
22        A.  No.  Never worked for them.
23        Q.  When did this account first -- when --
24   when was this account first input into Resurgent's
25   AMCS system?
```

Page 96

```
 1        A.  It would have been placed in
 2   November 8th, 2011, give or take a day.
 3        Q.  And can you tell me what exhibit and
 4   document and page number you're looking at to
 5   determine that?
 6        A.  I'm looking at Exhibit 7, the account
 7   event history, page six, the middle column
 8   references the purchase date.
 9        Q.  And so it would have been put in the
10   system in either that day or a day or so afterwards;
11   is that correct?
12        A.  Yes.
13        Q.  All right.  If you stay on that page,
14   the chargeoff date noted is 4/2/99.  Do you see
15   that?
16        A.  Yes, I do.
17        Q.  And what is that date exactly?
18        A.  That would be the date that First USA
19   charged off the balance.
20        Q.  And under that it says, original
21   placement balance.  What is that document?
22        A.  It's how much was placed, the account
23   balance when they placed it with our -- with PYOD.
24        Q.  Okay.  And if you look at the middle
25   column it says, current interest rate, .06 percent.
```

Page 97

1    What is that -- or I'm sorry.  .0600.
2         A.    Yes.  It should be the statutory
3    prejudgment interest rate for the jurisdiction.
4         Q.    Do you know if the contract -- scratch
5    that.
6              Do you know if the contracts that --
7    or the agreements that First USA had with its
8    consumers allowed for the charge of prejudgment
9    interest after an account was written off?
10        A.    I do not know.
11        Q.    And under that is daily interest.
12   What is that?
13        A.    If you were going to take the interest
14   rate at the amount, the balance that would show your
15   daily accrual.
16        Q.    What is interest effective date?  And
17   the date is 2/13/2013.
18        A.    I do not know.
19        Q.    And then the last column it says, last
20   interest update is 4/4/2012.  Do you know what that
21   is?
22        A.    No, sir.
23        Q.    Under funding date there's a date of
24   11/1/2012.  Do you know what that date is?
25        A.    It would be when the funding came

Page 98

1    through from PYOD to First USA.
2         Q.    When --
3         A.    I'm sorry.  I apologize.  The funding
4    from PYOD to B-Line.
5         Q.    Okay.  And the funding source First
6    Tennessee, what is that?
7         A.    I don't know.
8         Q.    Do you know if First Tennessee had any
9    kind of ownership interest in this account?
10        A.    Not to my knowledge.
11        Q.    Okay.  Well, what happened in this
12   account after it was opened up in November, 2011?
13        A.    In relation to?
14        Q.    I just want to go through generally
15   the account notes and so I can -- so we can make
16   sure we're on the same page and understand what
17   happened to the account along the way.
18        A.    Okay.  On page 3 of Exhibit 7.
19        Q.    All right.  I'm there.
20        A.    This is where I would start with
21   placement history.  It came into placement at
22   Resurgent House which is Resurgent Capital Services.
23   On December 16th it was placed with an
24   out-of-statute secondary, which is an out-of-statute
25   collection agency.  It's Nationwide Credit, Inc.

Page 99

1         Q.    Okay.  And let me ask you, what's the
2    relationship between Nationwide Credit, Inc. and
3    Resurgent?
4         A.    Resurgent would have retained them to
5    collect on the account.
6         Q.    Do they -- are they any kind of a
7    subsidiary or sister company --
8         A.    No.
9         Q.    -- to Resurgent?
10        A.    No, sir.
11        Q.    If Nationwide Credit did anything on
12   the account and they wanted to document that, would
13   their notes be -- account notes be linked with
14   Resurgent's account notes?
15        A.    No.
16        Q.    Do you know if when the account was
17   closed by Nationwide or sent back to Resurgent by
18   Nationwide, was there any data sent back to
19   Resurgent about what happened on the accounts while
20   Nationwide was trying to collect it?
21        A.    Well, two things.  One, any
22   correspondence they would have received they had
23   probably already forwarded on to us.  But as up
24   above on page 3 in the collections status history,
25   on January 23rd, 2012, where it went into VDS, which

Page 100

1    is verbal dispute, at the very end of that line
2    you'll see under app name it says, SUF.
3         Q.    Uh-huh.
4         A.    That means that Nationwide Credit or
5    whatever collection agency had it at that time
6    placed that account in the VDS.  So I wouldn't need
7    any data.  I would know that Nationwide Credit
8    received a verbal dispute on January 23rd, 2012.
9         Q.    If there was a recording of that call
10   is Nationwide supposed to forward that recording to
11   Resurgent?
12        A.    No.  There's no requirement for them
13   to forward it to us.
14        Q.    Is there any requirement that
15   Nationwide forward its internal collection notes to
16   Resurgent?
17        A.    No.
18        Q.    How does Resurgent know what was being
19   disputed between the consumer and Nationwide?
20        A.    Well, the point of the call we could
21   have reached out to Nationwide and said, you know,
22   what's going on.  What's happening.
23        Q.    Did that happen?
24        A.    I'm sorry?
25        Q.    Did that happen?

Page 101

1    A.  No, sir.  Because shortly after that
2  call we received written correspondence ourselves.
3    Q.  Does Resurgent require debt collectors
4  that it hires to keep collection notes documenting
5  their collection activities?
6    A.  I'm not sure if they require.  I've
7  never ran across where they didn't.
8    Q.  You mean where they didn't keep the
9  notes?
10    A.  Keep notes.
11    Q.  Typically when an account or typically
12  in the accounts you've seen do you have access to
13  the collection notes from the third-party collector?
14    A.  No.  I have to request them from them.
15    Q.  Okay.  Do you know if you or anybody
16  else at Resurgent requested the collection notes
17  from Nationwide?
18    A.  Don't know who requested them, but I
19  know we had to have given them to you in production.
20    Q.  And where are those?
21    A.  I believe this is Exhibit 10.
22    Q.  Okay.  How do you know that these are
23  Nationwide's notes?
24    A.  Well, only because I routinely see
25  notes from Nationwide and from other collectors, and

Page 102

1  they look exactly like this.
2    Q.  Can you tell when those notes were
3  requested?
4    A.  No.  No.  Not from this.
5    Q.  Can you tell when they were printed?
6  And by that I mean, in Nationwide's systems or from
7  Nationwide's system?
8    A.  There's a date on the print screen,
9  but I don't know what that date refers to.  It just
10  says, wait.
11    Q.  And that's 4/17/12?
12    A.  Yes.
13  (PLF. EXH. 15, October 2, 2013 Letter from NCI to
14  Erin Sellers, Compliance Manager, was marked for
15  identification.)
16  BY MR. HERRING:
17    Q.  I've marked Exhibit 15, which is the
18  letter our office received yesterday from Nationwide
19  in response to our subpoena stating that they were
20  unable to locate an account for Miss Thompson.
21    And I know you don't know their
22  internal goings-on, but have you ever seen a
23  situation where after Nationwide Credit sends a file
24  back to Resurgent that it deletes or removes the
25  file from its system?

Page 103

1    A.  No.
2    Q.  Do you know if Exhibit 10 is the
3  complete file for Nationwide?
4    A.  Since I can't speak for Nationwide, I
5  don't know.
6    Q.  Did anything happen in regards to this
7  file on Resurgent's end between the time it was sent
8  to Nationwide on December 16th and I guess when it
9  was sent back?
10    A.  On Resurgent's side?
11    Q.  Yes.
12    A.  We scanned the correspondence on
13  February 2nd, so that's prior before it came, the
14  dispute correspondence, which triggered the dispute
15  work flow.
16    Q.  Where are you looking?
17    A.  I'm sorry.  I'm on page 5 of 6 of
18  Exhibit 7.  At the bottom it says, documents in
19  OnBase.  That's a software system we have to hold
20  documents.  General correspondence, February 2nd,
21  dates stored.  And that dispute was scanned and
22  stored into the software system which is probably
23  what triggered the recall.
24    Q.  So is that a letter that Ms. Thompson
25  sent?

Page 104

1    A.  Yes, sir.  I believe so.
2  (PLF. EXH. 16, Handwritten Note from Frances McIntyre
3  Thompson, was marked for identification.)
4  BY MR. HERRING:
5    Q.  I'm handing you Exhibit 16 to your
6  deposition.  Do you know if that's the letter that
7  was scanned in?
8    A.  I believe so.  It was the earliest
9  letter she had.
10    Q.  The number 479225420, is that the
11  internal account number or what is it?
12    A.  Yes.  It's Resurgent's internal
13  number.
14    Q.  And then it says, dispute 2/1/2012 -
15  1/30/2012.  What is that date or range of dates
16  supposed to be documenting?
17    A.  It's supposed to be documenting either
18  the date of letter or date of receipt.
19    Q.  And would that be the receipt from
20  Ms. Thompson?
21    A.  No, sir.  It would be the receipt for
22  Resurgent, if it came through Nationwide.
23    Q.  Okay.  What number was that?
24    A.  16.
25    Q.  Do you know if Resurgent told

Page 105

1    Nationwide that this debt was out of statute?
2        A.  Yes.
3        Q.  Okay.  And show me where that's
4    documented.
5        A.  Well, Nationwide has -- they can see
6    some of the information that's in AMCS.  We provide
7    them with a placement file when we send the file to
8    them.  Out-of-stat date would be one of the
9    categories listed in that placement file.  And they
10   are one of our out-of-statute collectors.
11       Q.  Do you know if Nationwide records
12   calls that it has with consumers?
13       A.  I don't know if they do.
14   (PLF. EXH. 17, NCI Letter December 21, 2011, was
15   marked for identification.)
16   BY MR. HERRING:
17       Q.  Handing you Exhibit 17 to your
18   deposition, which are document Bates number 25, 26
19   and 27, which were produced to us by your lawyer.
20   Can you tell from looking at your file when
21   Resurgent received a copy of this letter?
22           MR. MOORE:  Object to the form of the
23   question.
24           THE DEPONENT:  No, sir.
25   BY MR. HERRING:

Page 106

1        Q.  When Nationwide sends out a letter to
2    a consumer on an account that's been placed with it
3    by Resurgent for collections, does that letter have
4    to be approved before -- approved by Resurgent
5    before it can be sent out?
6        A.  No, sir.
7        Q.  Do you know what Resurgent's policy or
8    procedure is in regards to reporting accounts to the
9    IRS where there's a settlement of that account for
10   accounts that are past the statute date or out of
11   statute?
12           MR. MOORE:  Object to the form.
13           THE DEPONENT:  I don't know as to
14   out-of-statute dates.
15   BY MR. HERRING:
16       Q.  Do you know one way or the other
17   whether it's legal to report as taxable income
18   payment amounts that are -- scratch that.  That's a
19   terrible question.
20           And do you know one way or the other
21   the laws governing reporting as taxable income
22   settlement amounts or amounts that are forgiven in
23   the payment of past due debts?
24           MR. MOORE:  Same objections.
25           THE DEPONENT:  I don't have a legal

Page 107

1    analysis.
2    BY MR. HERRING:
3        Q.  If you'll turn to page 27 of this
4    letter.  This was the next document provided, and
5    I've attached it as a part of this.
6            Do you know if this document was
7    supposed to be a part of the letter that was sent
8    out by NCI?
9        A.  It should be.
10       Q.  Okay.  Is that something Resurgent
11   requires?
12       A.  For the privacy notice?
13       Q.  Yes.
14       A.  Yes.
15       Q.  And that includes -- on this notice it
16   includes Resurgent Capital Servicings, LP and PYOD
17   as related companies that are providing the privacy
18   notice; is that correct?
19       A.  Yes, sir.
20       Q.  If you'll turn back to the AMCS notes,
21   Exhibit 7.  The original placement balance was
22   $4,192.65 according to that last page.  And then it
23   goes down, looking at page 3 of 6.  Then it goes
24   down when it's placed to -- with Nationwide to
25   $4,218.84.  Do you know why that is?

Page 108

1        A.  It goes up?
2        Q.  I'm sorry, yeah.  It goes up.
3            Is that the prejudgment interest
4    that's being added?
5        A.  That's my understanding.
6        Q.  Okay.  And sticking on that same page
7    under the placement history, under service there
8    where it says, Resurgent House; what does that mean?
9        A.  It's the designation for Resurgent
10   Capital Services.  It means, inhouse.
11       Q.  Okay.  And looking back at
12   Nationwide's notes, turning to the, I think it's the
13   third page, on December 27th, 2011, at 4:28 p.m. it
14   says, at 4:27 incoming call (205) 923-00067.
15           And that is the number that you-all
16   had for Ms. Thompson; is that correct?
17       A.  Yes.
18       Q.  Then below that it says, received a
19   call.  However, no response from the other end.
20   Then 4:20 -- at 4:28 p.m., incoming call letter
21   series.
22           Do you know what that means?
23       A.  No, I do not.
24       Q.  Do you think it means they were
25   calling in response to a letter that was sent out?

Page 109

1      MR. MOORE: Don't speculate.
2      MR. HERRING: If you know.
3      MR. MOORE: If you know, tell him. If
4  you don't know, tell him you don't know.
5      THE DEPONENT: I don't know.
6  BY MR. HERRING:
7      Q.   Then 4:31, the same day it says,
8  out-called. The debtor verified the name and the
9  address as the debtor. Didn't verify SSN. Informed
10 about that A/C.
11      Do you know what that stands for?
12      A.   No, sir.
13      Q.   Debtor said that it's 12 years old and
14 will think about it.
15      None of those notes as far as I can
16 tell ended up in Resurgent's records; is that
17 correct?
18      A.   That would be correct.
19      Q.   If a consumer refuses to pay or tells
20 a collector hired by Resurgent that they're not
21 going to pay on the account, what is that
22 third-party collector supposed to do in response to
23 that?
24      MR. MOORE: Object to the form. Don't
25 guess about what a third-party collector is supposed

Page 110

1  to do. If Resurgent has some sort of instruction
2  that it tells them what to do, I guess that's fine.
3  But he's asking you what a third party is supposed
4  to do under a hypothetical situation.
5      THE DEPONENT: And I don't know.
6  BY MR. HERRING:
7      Q.   Do you know what the law requires them
8  to do?
9      MR. MOORE: Same objections.
10     THE DEPONENT: No.
11 BY MR. HERRING:
12     Q.   Do you know what the law requires a
13 debt collector to do where a consumer tells a debt
14 collector they're not going to pay?
15     A.   No.
16     Q.   Do you know if Resurgent has any
17 requirement on third-party collectors that collect
18 debts that are sent to them by Resurgent? Do you
19 know if Resurgent has any requirement that they do
20 anything with that information?
21     MR. MOORE: Object to the form.
22     MR. HERRING: Hold on, Neil. With
23 regards to Resurgent.
24     MR. MOORE: I still object to the form
25 of that question.

Page 111

1      MR. HERRING: That's fine. I don't
2  care.
3      MR. MOORE: Right. So let me make my
4  objection. And if you understood that question,
5  have at it.
6      THE DEPONENT: I was just going to ask
7  with what information?
8  BY MR. HERRING:
9      Q.   If a consumer tells the third-party
10 collector hired by Resurgent, I'm not going to pay
11 this debt, is the third-party collector supposed to
12 do anything with that information in regards to
13 reporting it back to Resurgent?
14     MR. MOORE: Same objections.
15     THE DEPONENT: Not that I'm aware of.
16 BY MR. HERRING:
17     Q.   Are they supposed to send any
18 documentation to Resurgent that the consumer is
19 refusing to pay?
20     MR. MOORE: Same objections.
21     THE DEPONENT: I'm not aware of any
22 that they're supposed to return.
23 BY MR. HERRING:
24     Q.   Do you know if Resurgent provided
25 Nationwide with any instructions on what constitutes

Page 112

1  a disputed account?
2      A.   Not to my knowledge. Resurgent hires
3  third-party collectors to work the cases, comply
4  with all state laws and regulations for that
5  jurisdiction. But how they work the cases is left
6  in their discretion.
7      Q.   So looking at Resurgent's note, the
8  account was recalled on February 15th, 2012; is that
9  correct?
10     A.   Yes, sir.
11     Q.   And what exactly is a recall? What
12 does that mean?
13     A.   It could mean several things. A
14 recall if it's placed with a servicer, it means it
15 comes back to Resurgent.
16     Q.   In this context what does it mean for
17 this file?
18     A.   On February 15th, 2012, the recall
19 means that Resurgent pulled it back to work the
20 dispute.
21     Q.   And what did Resurgent do in response
22 to the dispute?
23     A.   In response to the dispute Resurgent
24 starts a dispute work flow by placing the account on
25 page 3. It actually got placed there on

Page 113

1    February 14th into WDS.
2        Q.   Okay.  Where are you looking?
3        A.   On page 3 at the top, collection
4    status history, February 14th, 2012.  It was placed
5    in WDS.  On page 2 under account letters, they
6    determined that the dispute was also requesting a
7    verification or validation, and they sent that.  And
8    on the 19th they sent -- the dispute department sent
9    the debtor a letter that the account was being
10   disputed and that we would begin investigating their
11   claim.
12       (PLF. EXH. 18, Resurgent Letter Feb. 15, 2012, was
13       marked for identification.)
14   BY MR. HERRING:
15       Q.   If you'll turn back to page 3 of 6.
16   At the top under collection status history where it
17   says, collection -- under the column, collection
18   status for the date February 14th, what is rank two?
19       A.   Ranking is an internal system so that
20   basically you have security.  If your rank, your job
21   position, is not higher than a two, you wouldn't be
22   able to change the status.  Anybody on the dispute
23   team would have a ranking higher than two, to come
24   out of dispute it would need one of them or someone
25   with a ranking higher.

Page 114

1        Q.   And what's the -- tell me the
2    rankings.
3        A.   One through five.
4        Q.   So whoever was handling the account at
5    that time didn't have the authority to change the
6    status of the account; did I hear you right?
7        A.   No, sir.
8        Q.   Okay.  Did you say higher than two can
9    change it or two through --
10       A.   Well, two could change it definitely.
11   They could close it out.
12       Q.   Okay.
13       A.   But someone that was in customer
14   service that wasn't authorized to work disputes
15   could not take it out of dispute back to active
16   because now dispute is investigating and their
17   investigation demands a higher scrutiny, a higher
18   ranking.
19       Q.   Okay.  And under account status
20   collections and then open paren, ten, close paren;
21   what does that mean?
22       A.   I don't know what the numbers mean.
23       Q.   User ID 177, do you know who that is?
24       A.   That is Nationwide Credit, Inc.
25       Q.   Then app name SUF, that's their

Page 115

1    system?
2        A.   Yes.  Servicer update file.  So they
3    can file that directly into our system.  Other
4    things they can't do like notes and all into our
5    system, but this they can.
6        Q.   So the verbal dispute that was entered
7    in this system on 1/23, that was entered in by
8    Nationwide?
9        A.   Yes, sir.
10       Q.   Do you know what, if anything,
11   Resurgent did in response to the verbal dispute?
12       A.   There would be nothing for Resurgent
13   to do.  It was still in Nationwide's hands at that
14   point.
15       Q.   And I'm not asking you whether they
16   should have.  I'm just asking you what, if anything,
17   they did.
18       A.   Nothing.
19       Q.   And under account status for
20   February 14, dispute 120, you don't know what that
21   means, or do you?
22       A.   No, sir.  I've always believed it was
23   the code for whatever compliance was or collections
24   was.
25       Q.   And under user ID, is S. Henderson 1,

Page 116

1    is that the employee that entered that data?
2        A.   Yes.  That changed the status.
3        Q.   And the collection status changed to
4    all general compliance on April the 3rd; is that
5    when you said the lawsuit was filed?
6        A.   Yes, sir.
7        Q.   Okay.  What happened after
8    February 14th?  Just where is the next note that
9    documents what Resurgent did?
10       A.   After February 14th, of course on the
11   19th we sent the correspondence that we realize the
12   consumer is disputing the account.
13       MR. MOORE:  Show him where that is.
14       THE DEPONENT:  I'm sorry, page 2.
15   It's under account letters.
16   BY MR. HERRING:
17       Q.   And that's -- I wanted to ask you
18   before you got to that.
19       Exhibit 18 to your deposition is a
20   letter dated February 15th, 2012.  What is that
21   letter?
22       A.   It's the February 15th verification of
23   debt letter.
24       Q.   And where is that?
25       A.   The verification itself, or on this

Page 117

1    report?
2         Q.   I'm sorry.  That was a bad question.
3    Where is that documented in the account notes that
4    that was sent?
5         A.   On page 2 under account letters.  It's
6    the one at the bottom.
7         Q.   Okay.  And I guess that's what was
8    confusing me because you were jumping -- you were
9    going to the 19th.
10             And this verification of debt letter
11   was sent in response to the January 13th, 2012,
12   letter; is that correct?
13        A.   Yes.
14        Q.   And what in this letter tells
15   Resurgent that Ms. Thompson is asking Resurgent to
16   verify the debt?
17        A.   Well, I certainly don't read the words
18   anywhere.  But I guess when it was received they
19   would have felt like verification would be the first
20   start in the dispute process.
21        Q.   If this letter of January 13th, 2012,
22   had been interpreted by the Resurgent to be a
23   refusal to pay letter, according to Resurgent's
24   procedures what would have happened next?
25             MR. MOORE:  Object to form.

Page 118

1             THE DEPONENT:  I don't know there is a
2    procedure as to what would happen next.  She's just
3    refusing to pay.  There certainly wouldn't be a
4    dispute work flow set up unless she said, I don't
5    owe this, it's charged off, I dispute it.
6    BY MR. HERRING:
7         Q.   At what point would Resurgent --
8    scratch that.
9             Is there anything that a consumer can
10   say or, I'm sorry, can put in writing to Resurgent
11   on a debt that's out of statute that Resurgent will
12   quit collecting on that debt?
13             MR. MOORE:  Same objection.  If you
14   know, tell him.
15             THE DEPONENT:  I don't know.
16   (PLF. EXH. 19, Validation of Debt Feb. 15, 2012, was
17   marked for identification.)
18   BY MR. HERRING:
19        Q.   I'm handing you Exhibit 19 to your
20   deposition.
21             Is that the validation of debt that
22   would have been a part of this February 15th,
23   letter?
24        A.   Yes, sir.
25             MR. MOORE:  Stan, obviously we'll be

Page 119

1    here as long as you like.  I'm not trying to drag it
2    out.  But if you do come to a natural breaking
3    point, let me know.  I'd like to walk around.
4             MR. HERRING:  That's fine.
5             (A recess transpired.)
6    BY MR. HERRING:
7         Q.   On this AMCS system when the employees
8    in the dispute department pull up the system, is
9    this the format they see it in?
10        A.   Yes.
11        Q.   I mean, are these screen shots?
12        A.   They are.  This account event history
13   puts everything in this report.  It looks a little
14   different in the system.  It's more you can go from
15   screen to screen very quickly with tabs, but --
16   which this report doesn't show the tabs.  But this
17   is all the information in it.
18   (PLF. EXH. 20, Resurgent Letter Feb. 19, 2012, was
19   marked for identification.)
20   BY MR. HERRING:
21        Q.   Okay.  I'm handing you Exhibit 20 to
22   your deposition which is a letter dated
23   February 19th, 2012.  Can you tell me for the record
24   just what this letter is and what the purpose of
25   this letter is?

Page 120

1         A.   This letter is when we've received a
2    dispute and it's to advise the consumer that we will
3    be looking into it, and that we'll make contact with
4    you with the results and investigate the claim.
5         Q.   And this is a form letter; is that
6    correct?
7         A.   Yes, sir.
8         Q.   What letter is this February 19th,
9    letter in response to, or what dispute is this
10   February 19th, letter in response to?
11        A.   It's really also in response to the
12   January 13th because once the account was placed in
13   the WDS as a dispute, written dispute received, this
14   is one of the first letters sent out.
15        Q.   What happened to trigger this letter
16   to be sent out?  And I don't mean the dispute.  I
17   mean what physical thing had to happen?  Is there an
18   automated system that kicks it out, or did a person
19   have to manually take some action to send the letter
20   out?
21        A.   It would be an automated system as
22   soon as it went into WDS.
23        Q.   And if you look down toward the bottom
24   of that first full paragraph it says, if your
25   account is currently being reported to the three

Page 121

1  major credit reporting agencies we will submit a
2  request to update your trade line to account
3  information disputed by consumer.
4      Do you see where I just read from?
5  A.  Yes.
6  Q.  Why does this letter say that when
7  this is an account that's not being reported?
8  A.  Because it's a form letter and it
9  could go to people whose accounts are being reported
10  or are not being reported.
11  Q.  And so there's no form letter that
12  goes to accounts for people who have accounts that
13  are not being -- I'm sorry.
14      There's no form letter that goes to
15  individuals who have accounts that are not being
16  reported; is that correct?
17  A.  No.  This would be the same dispute
18  letter whether it was being reported or not.
19  Q.  Has there ever been a discussion to
20  your knowledge at Resurgent that that language in
21  that paragraph is something that could lead people
22  to believe their account is being reported, credit
23  reported?
24  A.  Not to my knowledge.
25  Q.  The second to the last sentence in

Page 122

1  that long paragraph says, once the determination is
2  made we will contact you with the results of our
3  research.
4      Can you show me in the notes where it
5  was documented that Ms. Thompson, and in the letter
6  it says Ms. McIntyre, which are the same person, but
7  can you show me in the notes where Ms. Thompson was
8  contacted with the results of Resurgent's research?
9  A.  Well, the only results that were shown
10  was when -- was after the phone conversation and
11  attempts were made to reach the consumer by phone.
12  And at that point when they couldn't reach the
13  consumer they sent her the letter that contact
14  couldn't be made.
15  Q.  Is that the March --
16  A.  -- 28th, 2012, letter.
17  Q.  Can you tell me what were the results
18  of the research?
19  A.  There were truly no results of the
20  research between the time that letter went out and
21  the time the lawsuit was received.
22  Q.  Okay.  Tell me what Resurgent did to
23  research the dispute.
24  A.  Besides reaching out to the consumer?
25  Q.  Well, is that one thing they did?

Page 123

1  A.  Certainly.  Through SoundBite.
2  Q.  What else?
3  A.  They provided that information and
4  reached out to the consumer, sent correspondence,
5  sent the verification.  At this point after and
6  going back to Exhibit 7, after the March 19th phone
7  call other calls were attempted.  And that's when
8  the letter was sent out that contact can't be made
9  and the account will be returned to collections if
10  contact is not made.  Then within a couple of days
11  we had -- or just a few days we'd received the
12  lawsuit.  So then legal stopped the dispute work
13  flow and took over the account.
14  Q.  Okay.  Let me ask you this:  The
15  dispute that's referenced in this February 19
16  letter, what is your understanding from the notes of
17  the nature of the dispute, or what was Resurgent's
18  understanding of what was being disputed?
19  A.  I believe what was being disputed was
20  the fact the consumer was a little confused in what
21  charged off meant.  She believed that charged off
22  through the original creditor, it sounded from the
23  phone call that she thought it had just went away.
24  And not -- to her knowledge that the original
25  creditor had sold the account.  And that also that

Page 124

1  she'd spoken with an attorney, and that it was out
2  of stat and there was nothing that Resurgent could
3  do.
4  Q.  If a consumer refuses to pay on a debt
5  that's out of statute, what recourse does Resurgent
6  have to attempt to get the consumer to pay on that
7  debt?
8      MR. MOORE:  Object to form.  If you
9  know the answer, let him know.
10      THE DEPONENT:  I don't know all
11  recourses we would have.
12  BY MR. HERRING:
13  Q.  Well, what does Resurgent train its
14  employees regardless of what department they're in
15  to do if they're told by a consumer that this debt
16  is out of statute and I'm not going to pay it?
17  What's the next step that that employee is trained
18  to take?
19      MR. MOORE:  Same objection.
20      THE DEPONENT:  Well, an employee
21  wouldn't necessarily have to take any step with the
22  account.  The consumer doesn't want to pay.  The
23  account is still there.  It is collectible.  It
24  could conceivably go back to collections.  It could
25  go back to an agency to be collected on.  It could

Page 125

```
1    never be sued on.  It could never be reported.
2    BY MR. HERRING:
3        Q.   Is there a point as you understand it
4    where it's no longer collectible?
5        MR. MOORE:  Same objections.
6        THE DEPONENT:  If it is I'm not aware
7    of it.
8    BY MR. HERRING:
9        Q.   To your knowledge, does Resurgent have
10   any policy or procedure in place for debts that are
11   out of statute where collectors are told or required
12   to quit collecting on that debt?
13       MR. MOORE:  Same objections.
14       THE DEPONENT:  I don't know.
15   BY MR. HERRING:
16       Q.   And I said collectors.  I mean, any
17   employee at Resurgent that's working or collecting
18   on a file, is it the same answer?
19       MR. MOORE:  Same objection.
20       THE DEPONENT:  Yes.  I don't know.
21   BY MR. HERRING:
22       Q.   After Ms. Thompson sent in the
23   January 13, 2012, letter, did Resurgent undertake to
24   contact any of the previous owners or creditors on
25   the debt?
```

Page 126

```
1        A.   No.
2        Q.   Other than trying to contact
3    Ms. Thompson, what other research did Resurgent do
4    in regards to Ms. Thompson's dispute?
5        MR. MOORE:  Object to form.  Misstates
6    prior testimony.
7        MR. HERRING:  I'm not trying to do
8    that.  It was my understanding you said they
9    researched it.
10       THE DEPONENT:  They were in the
11   research process.
12   BY MR. HERRING:
13       Q.   Okay.
14       A.   But the lawsuit stopped that.
15       Q.   Well, if the lawsuit hadn't been
16   filed, what research had Resurgent intended on
17   doing?
18       A.   I don't know where the research would
19   have led them.
20       Q.   And that's not what I'm asking.  My
21   question is, what actions was Resurgent planning on
22   taking in order to research this account or the
23   dispute before the lawsuit was filed?
24       A.   Well, it's a little hard to answer
25   just because truly they could have taken any action
```

Page 127

```
1    at that point to try to resolve this so that it
2    didn't go back to collections through dispute.  I
3    guess I can just see a variety of options they could
4    have chosen.
5        Q.   Can you tell by looking at the file if
6    there are any actions that were planned -- that
7    Resurgent planned on taking that weren't taken?
8        A.   No, I can't.
9    (PLF. EXH. 21, Resurgent Letter Feb. 20, 2012, was
10   marked for identification.)
11       MR. HERRING:  I'll hand you Exhibit 21
12   to your deposition.
13       MR. MOORE:  Thank you.
14   BY MR. HERRING:
15       Q.   This appears to be the same letter as
16   Exhibit 20.  They just have different dates.  At the
17   top one is February 20, one is February 19th, can
18   you explain to me if two identical letters were sent
19   to Ms. Thompson two days apart, or can you tell by
20   looking at the records if these two letters were
21   sent out?
22       A.   No.  The records only reflect the date
23   of February 19th.
24       Q.   Do you have any explanation as to why
25   there're two letters that are the same letter but
```

Page 128

```
1    with just two different dates on them?
2        A.   No, I don't.
3        Q.   And looking at Exhibit 21, the
4    February 20th letter, on the top left there's a bar
5    code.  Do you see that?
6        A.   Yes.
7        Q.   And that's not on the February 19th
8    letter.  Does that mean anything to you?
9        A.   No, it doesn't.
10       Q.   Do you know which one of these is
11   actually sent to Ms. Thompson or both were?
12       A.   I don't know.
13   (PLF. EXH. 22, Handwritten Letter from Frances
14   McIntyre Thompson, was marked for identification.)
15   BY MR. HERRING:
16       Q.   I'm handing you Exhibit 22 to your
17   deposition which is a letter that is dated
18   February 20, 2012, from Ms. Thompson to Resurgent.
19       Do the records reflect that Resurgent
20   received this letter?
21       A.   The AMCS report on page 5 would
22   reflect the letter was received marked 2/28/2012.
23       Q.   What, if anything, did Resurgent do in
24   response to this dispute?
25       A.   Since the account was already in
```

Page 129

1    dispute work flow, there really wasn't anything else
2    to do. It was scanned and added to the
3    correspondence in OnBase where we keep all documents
4    received so that anyone working the dispute could
5    read both documents.
6          Q.   What's the next thing that happened in
7    this file after Resurgent received this letter?
8          A.   Well, the calls continued. The
9    attempt at calls. Some attempts were made in and
10   there was -- the account information was given to
11   SoundBite to attempt to start making calls as well.
12         Q.   Okay. And let me ask you this, when
13   was the first call by Resurgent made on this file?
14         A.   It looks like March 13th, 2012.
15         Q.   Did anything happen in the file
16   between the date of receipt of Exhibit 22, and March
17   13, 2012?
18         A.   I don't see anything.
19         Q.   Do you know what, if any, research was
20   done that may not be documented in these files to
21   look into Ms. Thompson's dispute?
22         A.   No.
23         Q.   Do you know when the file was sent to
24   SoundBite to begin making calls?
25         A.   It would have been on March 13th.

Page 130

1          Q.   And looking at page 4 of 6 of
2    Exhibit 7. Is that call at the bottom dated March
3    13, 2012, is that the same call that's documented on
4    the SoundBite note for March 13, 2012, or is that a
5    different call?
6          A.   No. It would be the same call.
7          Q.   In the March 14th call was that call
8    made by SoundBite or made by Resurgent?
9          A.   It would have been made through
10   SoundBite.
11         Q.   Are all the calls made on page 4 of 6
12   made through SoundBite?
13         A.   Yes. They would have been.
14         Q.   And how do you know that?
15         A.   Because in investigation and
16   discussions with how our system works through the
17   business software -- business solutions department,
18   these are calls that we forward to SoundBite. These
19   calls are set up. If these calls, they ring, ring,
20   ring, we have a notation that we've sent the call
21   through. SoundBite won't register the call unless
22   it's actually delivered either to a machine or a
23   person. But our system will keep the call that an
24   attempt at a call was made.
25         Q.   Looking at the same exhibit do you see

Page 131

1    there's a date entered for a call of 3/20/2012?
2          A.   Yes, sir.
3          Q.   And the followup date is 3/17/2012.
4                Do you know what -- first of all, I
5    guess that's a mistake. But do you know what the
6    followup is supposed to be?
7          A.   No, sir.
8          Q.   And the time zone codes over on the
9    far right where some of them are two and some of
10   them are zero, do you know what those mean?
11         A.   No, sir.
12         Q.   Okay. If you'll look at Exhibit 8.
13   These are all calls, as I understand it, that were
14   connected through SoundBite?
15         A.   Yes, sir.
16         Q.   Do you know if there are recordings
17   for these calls other than the March 19th, call?
18         A.   There are no recordings except for the
19   March 19th call.
20         Q.   And as I understood your testimony
21   earlier, you testified that all calls through the
22   dispute department are recorded.
23         A.   All calls that make -- that are
24   connected to Resurgent are recorded.
25         Q.   Okay. Was the call on 3/13/2012,

Page 132

1    connected to Resurgent?
2          A.   No, sir.
3          Q.   And how do you know that?
4          A.   Because it lasted 18 seconds. It was
5    delivered to a person and it never made the
6    transition to a live operator.
7          Q.   Okay. And how long -- how much time
8    would have to elapse for you to look at that and see
9    that it was transitioned to a live operator?
10         A.   I guess it wouldn't be a time lapse.
11   That would make me -- the time being that short
12   would indicate for me to look further. But our
13   records at Resurgent only have one phone call
14   recorded, and that's the March 19th call.
15         Q.   In the March 23rd call, was a message
16   delivered to a machine?
17         A.   Yes, sir.
18         Q.   But that wasn't recorded?
19         A.   No, sir.
20         Q.   And then the March 27th call was 23
21   seconds. And that one wasn't recorded?
22         A.   No, sir.
23         Q.   Under campaign/sub-campaign, what do
24   those numbers mean? Just take the one on March
25   13th, 2012, 2744RCS dispute in 03/13/12.

Page 133

1    A.   I don't know what 2744 is.  Unless
2    it's a SoundBite identification for Resurgent.
3    Q.   Do you know what RCS means?
4    A.   We use it around Resurgent as
5    Resurgent Capital Services.
6    Q.   Okay.
7    A.   I'm not sure if they also use that
8    acronym.
9    Q.   And "the dispute in," do you know what
10   that denotes?
11   A.   No, sir.
12   Q.   And under the column that says, node,
13   do you know what that information is?
14   A.   No, sir.
15   Q.   Okay.  Exhibit 9.  We'll pull that up.
16       What is this document?
17   A.   This document is a print screen of
18   AMCS.
19   Q.   And how is it different than
20   information found in Exhibit 7?
21   A.   Exhibit 9 on this print screen
22   actually shows how you could search for the account
23   in AMCS.  Exhibit 7 is clearly a report that AMCS
24   can issue.  But Exhibit 9 is just actually hitting
25   print screens.  At the top with search results you

Page 134

1    could see how when we pulled up that account it gave
2    us there are actually three records found.  And then
3    you could select the appropriate account, which they
4    did so down below.  You see that account ID about
5    midway on the page.  And this is how it looks to the
6    collectors or any other employees at Resurgent.
7    Each page off of Exhibit 7 has its own tab.  That's
8    how quickly we can tab the information in account --
9    in Exhibit 7.
10   Q.   Again, looking at Exhibit 9 there's an
11   account that's a Galaxy Asset account for Frances W.
12   McIntyre.  Do you see that?
13   A.   Yes.  The second record found.
14   Q.   Do you know what happened on that
15   account, whether it was paid, whether she refused to
16   pay it, or do you know?
17   A.   I don't know.
18   (PLF. EXH. 23, J.C. Christensen & Associates, Inc.
19   Letter 3/16/12, was marked for identification.)
20   BY MR. HERRING:
21   Q.   I'm handing you Exhibit 23 to your
22   deposition which is a -- which looks like a
23   collection letter dated March 16, 2012, from J.C.
24   Christian & Associates to Ms. Frances W. McIntyre.
25       Is this for the same account?

Page 135

1    A.   No.
2    Q.   Okay.  Which account is this for?
3    A.   I don't know.  Exhibit 9 references
4    that there are three accounts in our system.  And I
5    can't -- from this one print screen I can't read the
6    account number.  But the account number on
7    Exhibit 23 does not match the accounts we're
8    discussing.
9    Q.   That's one thing I was going to ask
10   you.  Is there a screen that would show the three
11   records found, all three of them?
12   A.   Yes.
13   Q.   Do you know if that was produced to
14   us?  I mean, I hadn't seen it, but...
15       MR. MOORE:  She might know whether
16   it's been introduced to me.
17       THE DEPONENT:  No.  I don't believe
18   so.  This one would have actually -- Exhibit 9 would
19   have actually shown it.  But when they selected this
20   account to review and to pull up, it just moved into
21   its way.
22   BY MR. HERRING:
23   Q.   On Exhibit 23 the file number at the
24   top right of the letter, whose file number is that?
25   Maybe a better question is, is that a Resurgent file

Page 136

1    number?
2    A.   It does not appear to be.
3    Q.   I think maybe some of the confusion is
4    is that it's the same -- it's the same original
5    creditor, correct, on Exhibit 23?
6    A.   Yes, sir.
7    Q.   The same current creditor, correct?
8    A.   Yes, sir.
9    Q.   And it's about the same amount, I
10   guess, depending on when you're looking.  It's about
11   the same amount as the other account, correct?
12   A.   Yes.  They are very close.
13   Q.   Did you look to confirm whether or not
14   these are the same -- this letter references the
15   same account as the one in Exhibit 7 that we've been
16   talking about?
17   A.   Did I look to see if Exhibit 23 is
18   referenced in Exhibit 7?
19   Q.   Well, yeah.  That was a bad question.
20   Just the account that we've been talking about that
21   Ms. Thompson was disputing, the one she disputed on
22   February 13th -- I'm sorry, January 13th,
23   February 20th, did you pull this account up in
24   you-all's records to confirm that they were, in
25   fact, different accounts?

Page 137

```
1           A.  No, sir.
2           Q.  All right.  I guess what I'd like to
3    do now is play the recording of the call and ask you
4    some questions about it.
5           Do you-all want to take a short break
6    before we do that?
7           MR. MOORE:  Sure.
8           (A recess transpired.)
9    (PLF. EXH. 24, Transcript of: Collector and Thompson,
10   was marked for identification.)
11   (PLF. EXH. 25, CD, was marked for identification.)
12   BY MR. HERRING:
13          Q.  Back on the record.  I'm marking
14   Exhibit 24 to your deposition a transcript that we
15   had typed up of the recording that we're getting
16   ready to listen to.  And I'm going to mark as
17   Exhibit 25 a CD that has the recording on it that
18   we'll mark the exhibit on the case and then turn
19   that over to the reporter after the deposition.
20          MR. MOORE:  I'd rather mark the actual
21   CD with the sticker.
22          MR. HERRING:  I don't care.
23          (THE FOLLOWING IS THE CD BEING PLAYED FOR
24   THE RECORD.)
25          SPEAKER:  Failed authentication.  Account
```

Page 138

```
1    number 479225420.  Press one to connect.  Sound byte
2    failed authentication.
3           COLLECTOR:  Thank you for holding for
4    customer service.  This is Aaron.  We are calling
5    today to help you resolve your dispute.  Who am I
6    speaking with?
7           THOMPSON:  Frances McIntyre.
8           COLLECTOR:  And the last four digits
9    of your Social.
10          THOMPSON:  I don't know whether, oh,
11   1079.
12          COLLECTOR:  Pardon me?  Okay.  1079?
13   Ma'am?
14          THOMPSON:  Yes.
15          COLLECTOR:  Okay.  You said 1079,
16   correct?
17          THOMPSON:  Yes.
18          COLLECTOR:  Okay.  And a current
19   mailing address?
20          THOMPSON:  Uh, what is this all about?
21          COLLECTOR:  Okay.  All right.  This is
22   about a, let's see here, a First USA Master Card --
23          THOMPSON:  Go ahead.
24          COLLECTOR:  -- that's currently in
25   dispute.  Uh, it has a balance of $4,283.45.
```

Page 139

```
1           THOMPSON:  Okay.
2           COLLECTOR:  We're -- we're calling you
3    to help you resolve this issue.
4           THOMPSON:  Well, there's no way that
5    you could help me resolve this issue.  That's a
6    14-year-old debt.  It's from 1998.
7           COLLECTOR:  Okay.
8           THOMPSON:  I don't know whether you're
9    aware of that.
10          COLLECTOR:  Let's see here.
11          Yes, it is, it is, it is old.  It was
12   sold into collections on April 2nd, 1999.  Uh, let's
13   see here, and the account is, let's see, not being
14   reported to your credit report.  Okay?  It's not being
15   reported at all, okay?
16          THOMPSON:  It's being charged -- it
17   was charged off because I became disabled.
18          COLLECTOR:  Okay.  Um, so do you have
19   any, let's see here, so the company sold it into
20   collections when you became disabled?
21          THOMPSON:  No, it was never turned
22   over to the collection agency.  They told me all I
23   had to do was send them a copy.  First USA, uh, said
24   I could send a copy of my disability papers so that
25   the account would be charged off, and that was when
```

Page 140

```
1    you said '98, I -- '99, I thought it was '98.
2           COLLECTOR:  Yeah, charge off means
3    they wrote the account off and sold it in the
4    collections as a bad debt.
5           THOMPSON:  Well, see, I, this is, you,
6    I, I don't understand why this, no, it was even,
7    even if that was what it was, nobody has contacted
8    me until now, and like you said, this is 1999 and
9    the debt was charged off making it that I was no
10   longer responsible.
11          COLLECTOR:  Okay.
12          THOMPSON:  And if someone else had
13   taken the debt, why is it that this is 2014, 2012,
14   and someone just, no, uh-uh.  That, I checked into
15   that once before, and it, the statute of limitations
16   is up on that, on that deal.
17          COLLECTOR:  Yes.  You are correct.
18   The statute of limitations, it is out of statute
19   since 2004, but even though it's out of statute,
20   it's still a collectible debt, and I do wanna let
21   know that, okay?
22          THOMPSON:  No, because I have spoken
23   to a lawyer about that, and I am not responsible for
24   the debt from 14 years ago.
25          COLLECTOR:  Okay.  Do you have an
```

Page 141

1   attorney --
2           THOMPSON:  Statute of limitations, so
3   you, the statute of limitations for you to recover
4   was, it ended in 2004.
5           COLLECTOR:  Yes.  Do you have an
6   attorney?
7           THOMPSON:  Yes.
8           COLLECTOR:  What's his name?
9           THOMPSON:  I'm not gonna give you my
10  attorney's name.
11          COLLECTOR:  Okay.
12          THOMPSON:  And I mean, like I said,
13  you did receive a certified letter, did you not?
14          COLLECTOR:  Let me check and see.
15          THOMPSON:  Cause this is the first
16  time I've heard about this -- from you.  You like
17  the third, somebody has taken over this --
18          COLLECTOR:  Yes, I'm showing --
19          THOMPSON:  Pardon me?
20          COLLECTOR:  Yes.  I am showing a
21  certified letter.
22          THOMPSON:  Uh-huh.
23          COLLECTOR:  Okay.  Okay.  Okay.  Well,
24  do you have any other questions for me about this
25  are process, ma'am?

Page 142

1           THOMPSON:  About what?
2           COLLECTOR:  Do you have any other
3   questions for me about this dispute process?
4           THOMPSON:  No.  Because when it, I'd
5   like to next time you contact me, if you contact me
6   again, would you please put it in writing so that I
7   can forward it to my attorney?
8           COLLECTOR:  Yes.  I've notated
9   everything we spoke about, okay?  Do you have any
10  other questions for me?
11          THOMPSON:  No.  I don't have any
12  questions.
13          COLLECTOR:  Okay.  Thank you for
14  calling.  Thank you for allowing me to assist you
15  today, okay, ma'am?
16          THOMPSON:  Thank you.
17          (End of CD.)
18  BY MR. HERRING:
19      Q.  I think there was one correction and
20  there may have been more.  But at the bottom of the
21  first page where it says it was still in.  I think
22  it should say, sold to.
23      A.  Yes.
24          MR. MOORE:  Maybe even sold into
25  collections.  Because he says that phrase again on

Page 143

1   the next page.  It says the company sold it into
2   collections.  But, yeah, I don't think it was still.
3   I think it was, "it was sold."  And then either "in"
4   or "into" or "on" after that.
5           MR. HERRING:  Well, do you want to, I
6   guess, by agreement have her put a line through it
7   and write "sold into"?
8           MR. MOORE:  Sure.  That's fine with
9   me.
10          MR. HERRING:  Deponent complying.
11          THE DEPONENT:  Do I need to initial or
12  anything?
13          MR. MOORE:  You can put your initials
14  there, sure.
15          MR. HERRING:  Were there any other
16  corrections that you-all heard other than the minor
17  um and uh-huh?
18          MR. MOORE:  There was one in the
19  middle of the second page, it says:  Collector.
20  Yes.  You are correct.  The statute of limitations
21  it is on statute since 2004.
22          I don't think he said it is on statute.
23  But I couldn't hear it well enough to figure out what
24  he did say.  Although let me see what my transcript --
25          MR. HERRING:  Off the record.

Page 144

1           (Off-the-record.)
2           MR. MOORE:  Why don't you note that is
3   out of statute, and initial that as well, please.
4           MR. HERRING:  Okay.  Is that it?
5           MR. MOORE:  Yeah.  Other than some
6   minor ums and ahs and things like that.
7   BY MR. HERRING:
8       Q.  Looking at Exhibit 7, it's under
9   account notes, page 2 of 6.
10      A.  Yes.
11      Q.  The second account note is dated March
12  19, 2012, and it has under "created by," A. Dargis.
13  And that's who was on the call, Aaron Dargis; is
14  that correct?
15      A.  Yes, it is.
16      Q.  And are these under "note" his
17  complete notes for that call?
18      A.  Yes.  They would be.
19      Q.  And his notes read, call out.  That
20  means it was a call from Resurgent on behalf of
21  Resurgent out to Ms. Thompson, correct?
22      A.  Yes.  Through SoundBite but out to
23  her.
24      Q.  Okay.  R-e-f-a-d-d, is that refused
25  address?

Page 145

```
1          A.  Yes.
2          Q.  EDU, a Master Card.  Does that mean he
3   educated her that this was a Master Card?
4          A.  Yes.
5          Q.  Gave or GVOC.  Gave original creditor?
6          A.  Yes.
7          Q.  And balance 4,283.45 dot dot chargeoff
8   date 4/2/1999.  And then it says the account is off
9   bureau.  Even if it's reported the credit bureaus
10  will not place this line on the report.
11          And if you'll turn to the transcript,
12  I guess it's on the first page where he's confirming
13  the information, and the second, the entry for
14  collector from the bottom.  It was sold into
15  collections on April 2nd, 1999.  Let's see here.
16  And the account is, let's see, not being reported to
17  your credit report, okay.  It's been -- it's not
18  been reported at all, okay.
19          That's the transcript of what he said.
20  And I'm trying to make -- I'm trying to just track,
21  and is there somewhere in there where he told her
22  even if it's reported that credit bureaus will not
23  place this line on a report?
24          A.  No.  I don't see it in the transcript.
25          Q.  Do you know why he would have put that
```

Page 146

```
1   in there?
2          A.  No.
3          Q.  Is there some training by Resurgent
4   that -- well, scratch that.
5          That sentence there, would that have
6   been manually typed or would that have been
7   something that could have been input by doing a key
8   code or like a function code or something like that?
9          A.  It should be manually typed.
10         Q.  Then looking back at Exhibit 7, the
11  notes continue:  Was told to send a copy of
12  disability papers and the company charged off the
13  account.  Out-of-statute date 4/2/04 -- 2004.
14  Refused to give attorney's name.  Customer refused
15  to cooperate with the dispute process.
16         Can you show me where Ms. Thompson
17  refused to cooperate with the dispute process?
18         A.  I think Mr. Dargis could take that
19  opinion from the section of the first page of the
20  transcript when Ms. Thompson said, well, there's no
21  way that you can help me resolve this issue.  And
22  that that statement is more of a --
23         Q.  More of a refusal to pay?
24         A.  More of a refusal that there's nothing
25  you can do.
```

Page 147

```
1          Q.  Okay.  So is it -- when Mr. Dargis
2   says, we're calling today to help you resolve your
3   dispute, who am I speaking with.  And then down to
4   the line you're talking about where it says, there's
5   no way you can help me resolve this issue; your
6   interpretation of that is, that that's what he was
7   referring to, that she was refusing to cooperate
8   with the dispute process?
9              MR. MOORE:  Object to form.
10             THE DEPONENT:  I guess I can see how
11  he felt that way reading the transcript.
12  BY MR. HERRING:
13         Q.  Are you aware of what the training is
14  that employees in the dispute department receive in
15  regards to communicating with a consumer to help
16  them resolve their dispute or investigate their
17  dispute?
18             MR. MOORE:  Object to form.
19             THE DEPONENT:  No.  Despite the other
20  training we've discussed.
21  BY MR. HERRING:
22         Q.  When I was asking you earlier about
23  the research that was done by Resurgent into the
24  dispute, do you consider this call a part of that
25  research?
```

Page 148

```
1          A.  Yes.
2          Q.  What information is Mr. Dargis
3   researching or trying to gather from Ms. Thompson in
4   this call?
5              MR. MOORE:  Object to form.  Calls for
6   speculation.
7              THE DEPONENT:  Oh, I'm sorry.
8              MR. MOORE:  That's all right.
9              MR. HERRING:  I asked a question --
10  no, I asked a question.  He objected and I was
11  waiting on you to --
12             THE DEPONENT:  I'm sorry.  Can you ask
13  again?  I apologize.
14             MR. HERRING:  Can you read that back?
15      (Question read back as instructed.)
16             MR. MOORE:  Same objection.  Answer if
17  you know.
18             THE DEPONENT:  Okay.  Well, I can't
19  speak for Mr. Dargis, but in the dispute process we
20  would always want to reach out to the consumer
21  first, and hear just basically what their dispute is
22  so that we can ask other questions than what's in
23  the letter and the correspondence.
24  BY MR. HERRING:
25         Q.  Okay.  If you'll turn to page 2 of the
```

Page 149

1  transcript, about halfway down the sentence, the
2  section where the collector says, yes, you are
3  correct, the statute of limitations, it is out of
4  statute since 2004.
5        Are you with me?
6    A.  Yes.
7    Q.  But even though it's out of statute
8  it's still a collectible debt and I do want to let
9  you know that, okay.
10       Does Resurgent expect consumers to
11 know what it means by, it's a collectible debt?
12       MR. MOORE:  Object to form.
13       THE DEPONENT:  I don't know.
14 BY MR. HERRING:
15   Q.  Before you went to work for Resurgent,
16 how long had you been a paralegal?
17   A.  Since '94.
18   Q.  And in your -- with your experience as
19 a paralegal and in the legal industry before you
20 went to work for Resurgent, did you have an
21 understanding as to whether a debt collector telling
22 a consumer that a debt is still a collectible debt
23 meant one way or the other whether that debt can be
24 sued on?
25       MR. MOORE:  Actually, I'm going to

Page 150

1  object to the form of that.  And more than that, I
2  don't think she has to answer questions about what
3  she personally believed in her life prior to coming
4  to work for this company.  It has nothing to do with
5  any issue in this case.  So unless you can convince
6  me otherwise, I'm going to tell her not to answer
7  that.
8  BY MR. HERRING:
9    Q.  Do you think the average consumer, as
10 the representative for Resurgent, understands
11 whether or not a collectible debt means a debt can
12 be sued on?
13       MR. MOORE:  I'm still going to object
14 to the form of that one, but I think you may have to
15 answer it.
16       THE DEPONENT:  I'm not sure what the
17 average consumer would necessarily understand.  This
18 particular consumer seemed to know some words that
19 sometimes I wouldn't think the average would know,
20 such as statute of limitations, and charged off, or
21 felt like she had an understanding of it.
22 BY MR. HERRING:
23   Q.  Okay.  So what does that mean?
24   A.  I mean, maybe in this instant case I
25 would think that she had maybe a little more

Page 151

1  knowledge than some people.
2    Q.  Because she knew the words, the
3  statute for limitations has run?
4    A.  Yes.
5    Q.  Okay.  Well, Resurgent is aware that
6  its collectors cannot do anything or say anything to
7  mislead consumers when they're collecting debt,
8  correct?
9    A.  Correct.
10   Q.  And they are aware that they can't
11 collect debt in an unfair way, correct?
12   A.  Define unfair.
13   Q.  That's what the statute says.
14   A.  Okay.
15   Q.  And Resurgent is aware that it can't
16 misrepresent the nature of a debt, correct?
17   A.  Certainly.
18   Q.  Do you believe that Resurgent
19 employees have any kind of obligation to, in a
20 situation like this, to educate the consumer as to
21 what they mean by a collectible debt?
22       MR. MOORE:  I object to the form of
23 that question as well.
24       THE DEPONENT:  I think the obligation
25 he had was for Mr. Dargis to explain that the debt

Page 152

1  was out of stat, but that we still could collect on
2  it and to allow her to ask any questions that she
3  wanted to ask, which I believe he did.
4  BY MR. HERRING:
5    Q.  And as you listened to that
6  conversation, it's your testimony that -- is it your
7  testimony that you think Ms. Thompson understood
8  what the statute of limitations meant in regards to
9  whether or not she could be sued on that debt?
10       MR. MOORE:  You know what, object to
11 the form of that.  It calls for speculation as to
12 what your client may or may not have known or
13 understood.  I don't think that's a fair question.
14 Tonya, if you can understand it on behalf of
15 Resurgent, then you go ahead and answer.
16       MR. HERRING:  Nice coaching.
17       THE DEPONENT:  I don't know what she
18 understood.
19 BY MR. HERRING:
20   Q.  If a Resurgent collector has any doubt
21 when they're collecting a debt as to whether or not
22 the consumer they've just spoken with or they're
23 speaking with is confused as to whether or not they
24 can be sued on an out-of-statute debt, do you think
25 that -- or is it Resurgent's policy that they should

Page 153

1    then educate that consumer on whether or not they
2    can be sued?
3              MR. MOORE:  Object to form.
4              THE DEPONENT:  I'm trying to think if
5    I completely understand the question.
6              MR. HERRING:  Yeah, me too.  Will you
7    read that back?
8              (Question read back as instructed.)
9              MR. MOORE:  Again, same objection.
10   It's as bad as I thought it was.
11             THE DEPONENT:  Well, my testimony is,
12   is that whenever Resurgent --
13             MR. MOORE:  Well, now think about his
14   question and answer his question.  He wants to know
15   if there's a policy or procedure if -- the way I
16   understand it, if there's a customer who is --
17             MR. HERRING:  Hold on.  Stop.  Stop.
18   No, Neil.  You don't get to coach her as to what it
19   is.  If she doesn't understand it, she can tell me.
20             MR. MOORE:  I'm just trying to get the
21   question out there so that you get an answer to it.
22             MR. HERRING:  If she doesn't
23   understand it she can tell me and we can start over,
24   okay?
25             THE DEPONENT:  Please start over.

Page 154

1    BY MR. HERRING:
2         Q.   Okay.
3         A.   Or rephrase it.
4         Q.   Is it Resurgent's policy that its
5    collectors -- scratch that.
6              Does Resurgent train its collectors in
7    regards to when they have to explain to a consumer
8    what the statute of limitations is, or what it means
9    or the legal effect that it has?
10             MR. MOORE:  Object to the form of the
11   question.
12             THE DEPONENT:  I don't know of any
13   training or policy and procedure that would go over
14   into legal advice to the consumer.
15   BY MR. HERRING:
16        Q.   What is a Resurgent collector --
17   scratch that.
18             When a consumer tells someone in the
19   dispute department to no longer contact them by
20   phone but to contact them in writing, can Resurgent
21   continue to contact that consumer by telephone?
22        A.   I don't know.
23        Q.   Did Mr. Dargis document in the
24   collection notes or anywhere else in the file that
25   Ms. Thompson had requested to be contacted by

Page 155

1    Resurgent in writing the next time they contacted
2    her?
3         A.   No, he did not.
4         Q.   Is that something that he should have
5    documented?
6         A.   I believe so.
7         Q.   Especially after he told her he was
8    documenting that, correct?
9              MR. MOORE:  Object to form.
10             THE DEPONENT:  I believe it should be
11   in his notes.
12   BY MR. HERRING:
13        Q.   Well, whether he told her he was going
14   to document that or not, that should be in the
15   notes, correct?
16        A.   It should be in his notes.  And that's
17   why we rely on the phone recording.
18        Q.   Why do you rely on the phone
19   recording?
20        A.   That's why we would then go to the
21   phone recording just to see if there's ever an issue
22   between what the notes say.  It's why the phone
23   calls are recorded.
24        Q.   Okay.  So how is that applicable to
25   whether or not he should have been -- or

Page 156

1    Ms. Thompson should have been contacted in writing?
2         A.   It's not.  I thought we were talking
3    about discrepancy of what's actually in the notes.
4         Q.   Okay.  Is it Resurgent's position that
5    the call on March 19th, 2012, was not an attempt to
6    collect this debt?
7         A.   The March 19th call?
8         Q.   Yes.
9         A.   No, sir.
10   (PLF. EXH. 26, Resurgent Letter march 28, 2012, was
11   marked for identification.)
12   BY MR. HERRING:
13        Q.   Handing you Exhibit 26 to your
14   deposition.
15             Okay.  The first line of this letter
16   from Resurgent to Ms. Thompson -- let me back up.
17   Just so we're clear, this is a letter March 28th,
18   2012, from Resurgent to Ms. Thompson; is that
19   correct?
20        A.   Yes, it is.
21        Q.   And it's for the same account,
22   correct?
23        A.   Yes.
24        Q.   And the first line states, information
25   you provided regarding this account has been

Page 157

1   forwarded to the customer service department for
2   research.
3           Can you tell me what that means?
4       A.   Correspondence we had received.
5       Q.   Okay. Anything else?
6       A.   (Deponent moves head side to side.)
7   No.
8       Q.   Any information in the March 19th call
9   that was forwarded to the customer service
10  department?
11      A.   No. It was notated in the system, but
12  other than that, no.
13      Q.   Is the customer service department
14  different from the dispute department?
15      A.   No. The dispute department is part of
16  customer service.
17      Q.   Okay. Which department would have
18  written this letter or would have input the command
19  to make this letter go out?
20      A.   It's an automated form letter that
21  should have came from the dispute department.
22      Q.   Do you know what the purpose of the
23  calls between March 19th, and March 28th, were, or
24  the attempted calls?
25      A.   Well, it was in the dispute queue. So

Page 158

1   that would mean the dispute team is still trying to
2   continually reach Ms. Thompson.
3       Q.   And can you tell from the notes why
4   they're trying to reach her? In other words, was
5   there something on the March 19th call they needed
6   clarified? Was there something in the letter that
7   still needs to be clarified or are they just trying
8   to get her to pay the debt?
9       A.   I can't tell from the notes.
10      Q.   When an account is with the dispute
11  team is the dispute team -- when they call are they
12  attempting to get the consumer to pay the debt?
13      A.   Certainly that resolution can be
14  reached. But they're also attempting to understand
15  the dispute and find out it if has any validity to
16  it.
17      Q.   Well, based on your listening to the
18  recording and what you see in the account notes, is
19  there anything in the dispute that is still unclear
20  with Resurgent after that call?
21      A.   I think the only thing that's unclear
22  is that the consumer believes the out of stat makes
23  it that the debt is gone. That no one can collect
24  on it because it's out of stat and because of its
25  age.

Page 159

1       Q.   And you think that's still unclear
2   after that call?
3           MR. MOORE: Object to form.
4           MR. HERRING: If you know.
5           MR. MOORE: Well --
6           THE DEPONENT: I don't know.
7           MR. MOORE: -- I don't even think
8   that's what she said. So, but it's your question.
9   BY MR. HERRING:
10      Q.   I'm just trying to understand. It's
11  in the dispute department and they're supposed to be
12  researching it and trying to gather any information
13  to clear up any confusion, I guess, or resolve any
14  issues. And I'm trying to understand what issues
15  they would need to try to resolve or try to
16  understand after March 19th other than the fact that
17  Ms. Thompson doesn't want to pay this.
18          MR. MOORE: Asked and answered. I
19  think she's already told you, but you-all can go at
20  it again. That's fine.
21  BY MR. HERRING:
22      Q.   Other than what you've already told me
23  is there any other information based on what you see
24  that needed to be researched?
25      A.   No.

Page 160

1           MR. HERRING: Let's take a break.
2           (A recess transpired.)
3   BY MR. HERRING:
4       Q.   I wanted to ask you the first part of
5   the recording that we listened to, it talked about
6   failed authentication, the account number, what was
7   that? And part of that's documented in the
8   transcript that's Exhibit 25.
9       A.   Yes. That's the connection from
10  SoundBite into our system.
11      Q.   Okay. And it -- what does failed
12  authentication mean?
13      A.   If we go back to Exhibit 11, with the
14  scripting call flow from SoundBite.
15      Q.   All right.
16      A.   And bear with me because I don't read
17  this all the time. It's every prompt that it gives
18  you. The failed authentication is a prompt where
19  they didn't get either the name to press the right
20  option that, no, this is not the party or either
21  they -- oh, I'm sorry.
22          MR. MOORE: Show him where it is in
23  the thing.
24          THE DEPONENT: Yes, page 7. Actually,
25  6 starts the DC not verified. And then if you go to

Page 161

```
 1       page 7, the agent here is right by prompt in the
 2       blue, first blue line:  SoundBite failed
 3       authentication, account number, and press one to
 4       connect.
 5                That's where that message stopped and
 6       sent it over to the live operator.
 7       BY MR. HERRING:
 8          Q.   So you're talking about at the bottom
 9       of the tape, first table under prompt, agent hears
10       then pass slash fail?
11          A.   Yes.
12          Q.   That's where you're talking about?
13          A.   Yes.
14          Q.   Is that correct?
15          A.   That's where it's reading from that.
16          Q.   And so that's not something that
17       Ms. Thompson would have heard; is that correct?
18          A.   I've never been on the consumer side,
19       but I don't believe that they hear that.
20          Q.   And while that's going on, is the
21       message above it supposed to be played to the
22       consumer?
23          A.   The message up above it would have
24       been played for the consumer.  And it started on
25       page 6.  It just gives one second of silence.
```

Page 162

```
 1          Q.   What's the step that is immediately
 2       before 1.1.9, the bottom of page 6?
 3          A.   Let me look from the beginning.
 4                If you look at page 5, section 1.1.4
 5       and 1.1.5.
 6          Q.   Okay.
 7          A.   At this point in the call you have the
 8       SoundBite is asking you for security purposes to
 9       confirm the last four digits, your name, and then
10       the last four digits of your Social Security number.
11       If at the second table if you did it correctly you
12       would go to the DC verified message.
13             MR. MOORE:  Do you see where she's
14       talking about, Stan?  Because she just said a second
15       table, and I don't know if that's --
16             MR. HERRING:  Yeah.  You're talking
17       about second table right there from the top.
18             THE DEPONENT:  Yes, sir.
19       BY MR. HERRING:
20          Q.   And the DC verified is on the next
21       page, 1.1.7; is that correct?
22          A.   Yes.  If it would have been verified.
23          Q.   And if it's not verified?
24          A.   It will ask you again, if you see,
25       "max tries" it will go "DC not verified."  Or it
```

Page 163

```
 1       could possibly go to "try again" and still get to
 2       "DC not verified," meaning you had no action in that
 3       time.
 4          Q.   So would Ms. Thompson if she got
 5       through to a human being, she would had to have gone
 6       through all these steps?
 7          A.   She would have had to.  Not all of
 8       them, because one step might change where you go
 9       whether you press one or two.  If you choose not to
10       put in the four digits, it gets you to the DC not
11       verified message, which is on 1.1.9 on page 6,
12       beginning.
13             MR. HERRING:  Okay.  That's all I
14       have.
15             EXAMINATION
16       BY MR. MOORE:
17          Q.   Tonya, I do want to ask you a couple
18       of followup questions to some things that
19       Mr. Herring asked.  And then a few questions of my
20       own.
21                You heard the recording that we played
22       on Mr. Herring's computer and read the transcript
23       that you provided, right?
24          A.   Yes.
25          Q.   Had you heard that recording before?
```

Page 164

```
 1          A.   Yes.
 2          Q.   Do you recognize that to be the
 3       recording of the phone call between the dispute
 4       resolution department and the plaintiff in this
 5       case?
 6          A.   Yes.
 7          Q.   As part of your preparation to testify
 8       today did you investigate and study up on how these
 9       recordings are kept and maintained?
10          A.   Yes, I did.
11          Q.   Is the recording that Mr. Herring
12       played for you 100 percent of the conversation
13       between the representative, Mr. Dargis and
14       Ms. Thompson?
15          A.   Yes, it was.
16          Q.   Can that recording be edited or
17       altered at Resurgent?
18          A.   No.
19          Q.   Can it be deleted?
20          A.   No.
21          Q.   And is the recording that was played
22       or has the recording that was played been altered or
23       edited in any way?
24             MR. HERRING:  Object to the form.
25             THE DEPONENT:  It had not been altered
```

Page 165

1    or edited.
2    BY MR. MOORE:
3        Q.   And I'll try to ask it again and maybe
4    I can get it without an objection.
5            Have you listened to the original
6    recording of this telephone call?
7        A.   Yes.
8        Q.   And is it identical to the one
9    Mr. Herring just played to you?
10       A.   Yes, it was.
11       Q.   All right.  And the recording that you
12   listened to that's on the system at Resurgent, has
13   it been altered or edited in any way?
14       A.   No.
15       Q.   And it's the same one you just heard
16   in this room?
17       A.   Yes.
18       Q.   All right.  You were also asked some
19   questions about the SoundBite system and the prompts
20   that a consumer is going to have to go through
21   before they can hook up with a live collector.  Do
22   you remember answering those questions?
23       A.   I do.
24       Q.   And as part of your preparation to
25   testify on behalf of Resurgent, did you investigate

Page 166

1    and study up on the SoundBite system that Resurgent
2    uses for its dispute resolution calls?
3        A.   Yes, I did.
4        Q.   And as a result of that investigation,
5    do you know whether or not it is possible for
6    someone who gets one of these SoundBite calls to
7    bypass these prompts and jump right to a collector?
8        A.   No, they cannot.
9        Q.   Is it possible to short-circuit those
10   prompts so that you don't have to listen to the mini
11   Miranda?
12       A.   No.
13       Q.   And as part of your investigation and
14   preparation to testify today, did you look into
15   whether or not the SoundBite system was operational
16   and effective in March of 2002?
17       A.   Yes, I did.
18       Q.   And what did you find out?
19       A.   It was.
20       Q.   And did you investigate whether or not
21   there were any maintenance issues or downtime with
22   the system?
23       A.   I did.  And there was none for March
24   of 2012.
25       Q.   Were there any times during March of

Page 167

1    2012 where the system was just simply not working
2    for any reason whatsoever?
3        A.   There was not.
4        Q.   All right.  And based on your
5    investigation into this case and into this call, did
6    Ms. Thompson have to go through the SoundBite system
7    before she could ever speak to Mr. Dargis?
8        A.   Yes.
9        Q.   All right.  The recordings that are
10   made by Resurgent, where are they -- where are they
11   saved, do you know?
12       A.   They're saved on our database.
13       Q.   And where is that database located?
14       A.   Well, we have servers in Greenville,
15   and we also have servers in Cincinnati.  So it's
16   backed up to Cincinnati daily and weekly.
17       Q.   And how long are these recordings
18   kept?
19       A.   Forever.
20       Q.   And how do you -- how do you identify
21   a recording -- and I don't even care.  That's fine.
22           At Resurgent who has access to these
23   recorded dispute resolution calls?
24       A.   A very limited amount of employees.
25       Q.   Okay.  And what department do those

Page 168

1    employees work in?
2        A.   In our IT department.
3        Q.   And is the IT department in the
4    business solutions department?
5        A.   Yes.
6        Q.   Are those the individuals you met with
7    to prepare to testify about this aspect of the case?
8        A.   Yes.
9        Q.   And those individuals who do have
10   access to the system, can they get in there and
11   delete it?
12       A.   No.
13       Q.   Well, but can they get in there and
14   edit it?
15       A.   No.
16       Q.   As part of your work preparing to
17   testify for Resurgent today, did you look into
18   whether or not we had any technical problems
19   with the recording system at Resurgent in March of
20   2012?
21       A.   Yes, I did.
22       Q.   And were there any issues or problems
23   with the recording system?
24       A.   None in March of 2012.
25       Q.   And was there a point in time where it

Page 169

1    just wasn't working?
2         A.   No.
3         Q.   Or where it was missing calls?
4         A.   No.
5         Q.   Or where it got in some calls and
6    deleted them by mistake?
7         A.   No.
8         Q.   Are you aware of any failings or any
9    problems with the system whatsoever in March of
10   2012?
11        A.   No.
12        Q.   When someone receives a call from
13   SoundBite as part of the dispute resolution process,
14   is there a set amount of time it's going to take for
15   them to work their way through the prompts and get
16   connected to a live collector, or does it vary every
17   time?
18        A.   It varies every time.
19        Q.   How do you know that?
20        A.   Well, from reviewing reports there's
21   not a set -- there's not a set time because it
22   changes with the options.
23        Q.   Explain what that means.
24        A.   Well, the consumer is given several
25   options.  They can press one to confirm their name

Page 170

1    or press two, and depending on the options,
2    SoundBite will give them several minutes, several
3    tries depending on which option.  It will replay
4    some messages when it thinks no option has been
5    made.  So it just makes the time vary.
6         Q.   Once I've hit all the right buttons is
7    there always a collector immediately available or am
8    I to have to hold for a collector?
9         A.   You might have to hold.
10        Q.   And I said, collector.  I mean,
11   dispute resolution.
12        A.   Certainly.  You might have to hold for
13   a few seconds, but relatively they're there.
14        MR. HERRING:  When you say collector
15   she knows what you mean.  When I say it she doesn't
16   know what I mean.
17        MR. MOORE:  She's not guessing what
18   you mean.  What's important is that you know what
19   you mean.
20   BY MR. MOORE:
21        Q.   Are you aware of any evidence that the
22   SoundBite system was not working the way it was set
23   up to work on March 19, 2012?
24        A.   No.
25        Q.   Are you aware of any evidence that the

Page 171

1    recording system at Resurgent was not working the
2    way it was supposed to work on March 19, 2012?
3         A.   No.
4         Q.   All right.  You were asked a lot of
5    questions early in your deposition about written
6    policies which may or may not exist, and training
7    that was provided to the collectors.  Whether or not
8    it's a written policy or whether or not it's just
9    live training, what are the dispute resolution
10   personnel trained to do or trained -- strike that
11   question.
12        Let me get -- whether it's a written
13   policy or not, what are the dispute resolution
14   personnel trained in regarding credit reporting
15   out-of-statute debts?
16        MR. HERRING:  Object to the form.
17        THE DEPONENT:  I don't understand.
18   BY MR. MOORE:
19        Q.   All right.  Do the dispute resolution
20   people get any training about whether or not an
21   out-of-statute debt is going to be credit reported?
22        A.   They would have the training through
23   the FCRA and FDCPA.  They would have basic training.
24        Q.   Uh-huh.  And what would that be as far
25   as out-of-statute debts and credit reporting?

Page 172

1         A.   That we would not report.
2         Q.   And you were talking to Mr. Herring
3    earlier about what kind of manuals you received when
4    you were doing the training, and he asked was it the
5    FDCPA itself or was it a summary of the FDCPA.  Do
6    you remember that?
7         A.   Yes.
8         Q.   And you said unfortunately it was the
9    FDCPA itself, do you remember that?
10        A.   Yes.
11        Q.   What did you mean by that?
12        A.   Because I had to read it, and
13   unfortunately a summary would have been nicer or a
14   better written summary would have been nice instead
15   of reading the whole FDCPA.
16        Q.   Well, do you have any complaints about
17   the effectiveness of the training that you received?
18        A.   No.  It was very thorough.
19        Q.   You were also asked questions about
20   when Resurgent assigned an account to Nationwide for
21   collection.  Do remember that in general?
22        A.   Yes.
23        Q.   Let me ask you this, when Resurgent
24   sends an account to Nationwide, does Resurgent
25   reserve the right to tell Nationwide how they're

Page 173

1   supposed to do their job?
2        A.   No.
3        Q.   Does Resurgent actually get involved
4   with Nationwide saying here's how you're going to
5   collect this, here's how you're going to place phone
6   calls, here's when you're going to send letters?
7        A.   No.
8        Q.   Same question with PYOD and Resurgent.
9   Does PYOD control how Resurgent collects debt?
10       A.   No.  Resurgent has full authority.
11       Q.   Does PYOD, have they reserved the
12   right though to say, hey, we're going to come in
13   here, and we're going to tell you when to make phone
14   calls, and we're going to tell you when to send
15   letters, we're going to tell you how to collect this
16   debt?
17       A.   No.
18       Q.   Does PYOD have any control over how
19   Resurgent collects debts?
20       A.   No.
21       MR. MOORE:  Tonya, thanks.  That's
22   what I've got, unless Mr. Herring has some more
23   questions.
24            EXAMINATION
25   BY MR. HERRING:

Page 174

1        Q.   Just a few.
2             Do you know if there's a written
3   contract between Resurgent and Nationwide?
4        A.   I do not know specifically.
5        Q.   Do you know generally?
6        A.   Generally we have contracts with a lot
7   of the firms and the agencies.  I just haven't seen
8   all of them or seen a specific one with Nationwide.
9        Q.   Are those contracts, do those
10   contracts change depending on which debt or what
11   kind of debt is being collected, or is it just one
12   general contract that I guess governs all the debts
13   that would be assigned?
14       A.   I don't know.
15       Q.   Have you ever seen those contracts?
16       A.   I've seen a couple of them with the
17   law firm, but never with the collection agency.
18       Q.   Okay.  I want to go back to when you
19   were answering Mr. Moore's questions about the
20   recording, and he was asking you has it been edited,
21   altered, deleted, that kind of thing.  How do you
22   know it hasn't been edited and altered or deleted or
23   any of them haven't been deleted?
24       MR. MOORE:  Any of them?  I just want
25   to make sure I heard your question, right.

Page 175

1        MR. HERRING:  Well, I know this one
2   hadn't been deleted.  I was trying to clarify that.
3   But there are three other calls where there was a
4   connection made between Ms. Thompson or that number
5   and Resurgent.  Do you recall those being listed?
6        THE DEPONENT:  Yes.
7        MR. MOORE:  Object to the form of the
8   question.
9   BY MR. HERRING:
10       Q.   I'm not saying conversation happened.
11   I don't know.  But how do you know that?  And maybe
12   to make it simpler, how do you know that the
13   recording was not edited in any way?
14       A.   Because that's how the system works.
15   I met with the business solutions department and the
16   IT department, and no one has deletion -- what's the
17   word I'm looking for, approval, authority to delete
18   anything.  There's authority to replay, authority to
19   download if saving to an external device, and an
20   authority to listen.  And those are even limited to
21   a very few amount of people.
22       Q.   So while the recording is on the
23   system, is it your testimony that it's impossible to
24   edit the recording?
25       A.   Yes.

Page 176

1        Q.   And that's based on what you were told
2   by the people in your IT department?
3        A.   It's based on what our system is and
4   what our system is capable of.
5        Q.   And it's a computer system, right?
6        A.   Yes.
7        Q.   And it's impossible for that recording
8   to be deleted?
9        A.   Absent the entire system crashing,
10   there is no delete option.
11       Q.   If the recording is taken off of the
12   system can it be altered at that point or do you
13   know?
14       A.   I don't know.
15       Q.   The information that you testified
16   about SoundBite whether it was operational and
17   effective and Mr. Moore kept calling it, "during
18   your investigation", was your investigation as he
19   called it, anything more than a phone conversation
20   with the people at SoundBite?
21       A.   Well, no, the people at SoundBite did
22   have a conference call with me.
23       Q.   Okay.  Did you review any documents,
24   did you look at information about their system or
25   was the fact that it was operational, that it was

Page 177

```
 1    effective, it was not down, it was working, is all
 2    that based on what they told you?
 3        A.   It's all based on information that
 4    that they told me, and they gave me a login to their
 5    system for me to --
 6        Q.   I'm sorry.  Go ahead.
 7        A.   I'm sorry -- for me to pull this
 8    particular account and any other accounts and
 9    reports.
10        Q.   Okay.  And when you were in their
11    system did you investigate the -- what the SoundBite
12    people told you about it being operational back in
13    March and effective and not down and that kind of
14    thing?
15        A.   Well, I pulled the report and that was
16    just based on conversations with them.
17        Q.   And by report is that the document
18    you-all produced?
19        A.   Yes, sir.
20        Q.   Okay.  Would you even know how to
21    investigate that in their system on your own?
22        A.   No.
23        Q.   All right.  Is the training that the
24    Resurgent employees received regarding credit
25    reporting, and regarding the questions Mr. Moore was
```

Page 178

```
 1    asking you a minute ago about credit reporting, is
 2    that training you referenced documented in anywhere
 3    -- in any place at Resurgent?
 4        A.   Not any that I'm aware of with the
 5    exception of the FDCPA and the FCRA we discussed.
 6        Q.   And what's the name of the person that
 7    does the FCRA training or that did it -- let me back
 8    up.
 9             What's the name of the person who
10    would have done the FCRA training for the dispute
11    employee in this case?
12        A.   Back in 2011?  I don't know.  They
13    would have been in our compliance department.
14        Q.   Who does that now?
15        A.   Luke Umstetter.
16        Q.   Will you spell that?
17        A.   It's U-m-s-t-e-t-t-e-r.
18        Q.   And the first name was Luke?
19        A.   Luke.  Yes.  Sorry.  L-u-k-e.
20        Q.   Does he also do the FDCPA training?
21        A.   Yes.  At least it all goes through
22    him.  He's in-house counsel.
23        Q.   I couldn't hear you, did you say he's
24    in-house counsel?
25        A.   Uh-huh.
```

Page 179

```
 1        MR. HERRING:  Okay.  All right.
 2    That's all I have.
 3        MR. MOORE:  That's it.
 4        (The Witness, after having been advised
 5    of her right to read and sign this transcript, does
 6    waive that right.)
 7        (Deposition concluded at 4:37 a.m.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 180

```
 1    CERTIFICATE OF REPORTER
 2
 3        I, Michele E. Becker, Registered Professional
 4    Reporter and Notary Public for the State of South Carolina at
 5    Large, do hereby certify that the foregoing transcript is a
 6    true, accurate, and complete record.
 7        I further certify that I am neither related to
 8    nor counsel for any party to the cause pending or interested
 9    in the events thereof.
10        Witness my hand, I have hereunto affixed my
11    official seal this 14th day of October, 2013 at Greenville,
12    Greenville County, South Carolina.
13
14
15
16
17
18
19
20
21                _____
22                Michele E. Becker,
23                Registered Merit Reporter
24                My Commission expires
25                November 21, 2021
```

|   |   |   |   |
|---|---|---|---|
| 1 | I N D E X | | |
| 2 | PAGE LINE | | |
| 3 | TONYA HENDERSON | 3 | 2 |
| 4 | EXAMINATION | 3 | 4 |
| 5 | BY MR. HERRING: | | |
| 6 | EXAMINATION | 163 | 15 |
| 7 | BY MR. MOORE: | | |
| 8 | EXAMINATION | 173 | 24 |
| 9 | BY MR. HERRING: | | |
| 10 | CERTIFICATE OF REPORTER | 180 | 1 |
| 11 | | | |
| 12 | REQUESTED INFORMATION INDEX | | |
| | (No information was requested.) | | |
| 13 | | | |
| 14 | PLAINTIFF'S EXHIBITS | | |
| 15 | PAGE LINE | | |
| 16 | PLF. EXH. 5, Re-Notice to Take | 10 | 3 |
| 17 | Deposition of 30(b)(6) Corporate | | |
| 18 | Representative or Resurgent | | |
| 19 | Capital Services, L.P. | | |
| 20 | PLF. EXH. 6, Resurgent Capital | 15 | 10 |
| 21 | Services Credit Bureau Reporting | | |
| 22 | Policy | | |
| 23 | PLF. EXH. 7, Account Event | 18 | 17 |
| 24 | History Start Date 2/13/2003 - | | |
| 25 | End Date 2/13/2013 | | |

|   |   |   |   |
|---|---|---|---|
| 1 | PLAINTIFF'S EXHIBITS CONT'D | | |
| 2 | PAGE LINE | | |
| 3 | PLF. EXH. 20, Resurgent Letter | 119 | 18 |
| 4 | Feb. 19, 2012 | | |
| 5 | PLF. EXH. 21, Resurgent Letter | 127 | 9 |
| 6 | Feb. 20, 2012 | | |
| 7 | PLF. EXH. 22, Handwritten Letter | 128 | 13 |
| 8 | from Frances McIntyre Thompson | | |
| 9 | PLF. EXH. 23, J.C. Christensen & | 134 | 18 |
| 10 | Associates, Inc. Letter 3/16/12 | | |
| 11 | PLF. EXH. 24, Transcript of: | 137 | 9 |
| 12 | Collector and Thompson | | |
| 13 | PLF. EXH. 25, CD | 137 | 11 |
| 14 | PLF. EXH. 26, Resurgent Letter | 156 | 10 |
| 15 | march 28, 2012 | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

|   |   |   |   |
|---|---|---|---|
| 1 | PLAINTIFF'S EXHIBITS CONT'D | | |
| 2 | PAGE LINE | | |
| 3 | PLF. EXH. 8, SoundBite Report | 24 | 20 |
| 4 | PLF. EXH. 9, SoundBite Account | 24 | 22 |
| 5 | Information | | |
| 6 | PLF. EXH. 10, Nationwide Notes | 24 | 24 |
| 7 | PLF. EXH. 11, Scripting/Call Flow | 31 | 25 |
| 8 | PLF. EXH. 12, State of Alabama - | 76 | 21 |
| 9 | June 2, 2005 Letter from Nancy L. | | |
| 10 | Worley, Secretary of State | | |
| 11 | PLF. EXH. 13, Performance | 77 | 19 |
| 12 | Coaching Form | | |
| 13 | PLF. EXH. 14, Email Set. 30, 2011 | 78 | 1 |
| 14 | with attached documents | | |
| 15 | PLF. EXH. 15, October 2, 2013 | 102 | 13 |
| 16 | Letter from NCI to Erin Sellers, | | |
| 17 | Compliance Manager | | |
| 18 | PLF. EXH. 16, Handwritten Note | 104 | 2 |
| 19 | from Frances McIntyre Thompson | | |
| 20 | PLF. EXH. 17, NCI Letter December | 105 | 14 |
| 21 | 21, 2011 | | |
| 22 | PLF. EXH. 18, Resurgent Letter | 113 | 12 |
| 23 | Feb. 15, 2012 | | |
| 24 | PLF. EXH. 19, Validation of Debt | 118 | 16 |
| 25 | Feb. 15, 2012 | | |