FILED
2013 Nov-18 PM 03:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FRANCES MCINTYRE THOMPSON

     Plaintiff,    C.A. NO.: 12-CV-01018-JEO
VS
RESURGENT CAPITAL
SERVICES, L.P.; PYOD, LLC,

     Defendants.

30b6
DEPOSITION OF:   JEAN PAUL TORRES

DATE:      October 10, 2013

TIME:      8:30 a.m.

LOCATION:   A. William Roberts, Jr. & Associates
            33 Market Point Drive
            Greenville, SC

TAKEN BY:   Counsel for the Plaintiff

REPORTED BY:   MICHELE E. BECKER,
              Registered Merit Reporter

A. WILLIAM ROBERTS, JR., & ASSOCIATES
Fast Accurate & Friendly
Charleston, SC   Hilton Head, SC   Myrtle Beach, SC
(843) 722-8414   (843) 785-3263   (843) 839-3376

Columbia, SC   Greenville, SC   Charlotte, NC
(803) 731-5224   (864) 234-7030   (704) 573-3919

**Page 2**

APPEARANCES OF COUNSEL:
ATTORNEY FOR THE PLAINTIFFS
   FRANCES MCINTYRE THOMPSON:

   WATTS & HERRING, LLC
   BY: M. STAN HERRING
   The Kress Building
   301 19th Street North
   Birmingham, AL 35203
   (205) 879-2447
   stan@wattsherring.com

ATTORNEY FOR THE DEFENDANT
   RESURGENT CAPITAL SERVICES, L.P.; PYOD, LLC:
   FERGUSON, FROST & DODSON, LLP
   BY: NEAL D. MOORE, III
   2500 Acton Road, Suite 200
   Birmingham, AL 35243
   (205) 879-8722
   ndm@ffdlaw.com

**Page 3**

P-R-O-C-E-E-D-I-N-G-S
JEAN PAUL TORRES
being first duly sworn, testified as follows:

   MR. MOORE: Stan, since she's not an Alabama court reporter, I don't know if she's aware of our usual stipulations. Do you want to take it pursuant to those or not.

   MR. HERRING: Yeah. That's fine. It's pursuant to the usual stipulations and the Alabama Rules of Civil Procedure.

   MR. MOORE: Yeah.

   MR. HERRING: And we both agree she's competent and can take the deposition and all that?

   MR. MOORE: Correct. Absolutely.

   MR. HERRING: Unlike the two of us.

   MR. MOORE: Indeed. As the record will attest.

EXAMINATION
BY MR. HERRING:

   Q.   All right, sir. Would you please identify yourself for the record?

   A.   Yes. My name is John Paul Torres.

   Q.   And where do you currently live, Mr. Torres?

   A.   In Greenville, South Carolina.

**Page 4**

   Q.   And is it your understanding that you're here today as the corporate representative for PYOD, LLC?

   A.   Yes, sir.

   Q.   And that's in the case of Frances McIntyre Thompson versus Resurgent Capital Services, LP and PYOD, LLC; is that your understanding?

   A.   Yes, sir.

   Q.   Have you ever given a deposition before?

   A.   I have, yes.

   Q.   How many times?

   A.   Honestly I don't remember, but it's been a good number.

   Q.   And were all those times in your capacity as a representative for PYOD?

   A.   No. I believe actually this is my first time as a representative for PYOD.

   Q.   Before we get too far in and since you've done this before, I know you understand the rules, but I just want to remind you. I'm going to be asking you a series of questions and I need you to let me finish asking my question before you answer. And if I don't ask a clear question, please ask me to rephrase it or if you don't understand it,

Page 5

1  please ask me to rephrase it.
2       If you need to take a break, we can
3  take a break. I'd just ask that you answer the
4  question that's on the table before we take a break;
5  is that fair?
6       A.  Yes.
7       Q.  Okay. What did you do to prepare for
8  your deposition today?
9       A.  I reviewed the documents, the
10 complaint, the notice of deposition, and I also
11 reviewed with my attorney Neil Moore.
12      Q.  Okay. Did you review your answer in
13 the case?
14      A.  I did not review it recently, but I
15 have reviewed it before.
16      Q.  Okay. Are you aware of whether your
17 lawyer has filed an answer in this case?
18      A.  Yes.
19      Q.  Okay. And you say he has?
20      A.  Yes.
21      Q.  All right. And where are you
22 currently employed?
23      A.  Resurgent Capital Services.
24 (PLF. EXH. 1, Re-Notice to Take Deposition of
25 30(b)(6) Corporate Rep. of PYOD, LLC, was marked for

Page 6

1  identification.)
2  BY MR. HERRING:
3       Q.  I'm handing you what's marked as
4  Exhibit 1 to your deposition. Have you seen this
5  document before today?
6       A.  Yes.
7       Q.  Are you familiar with the corporate
8  structure of PYOD?
9       A.  Yes.
10      Q.  Okay. Explain the corporate structure
11 to me of PYOD.
12      A.  Well, PYOD is a limited liability
13 company that's 100 percent owned by Sherman
14 Originator, LLC.
15      Q.  Where is Sherman Originator located?
16      A.  Well, they -- it's based out of an
17 office in Charleston, South Carolina for Sherman
18 Capital Markets.
19      Q.  And what does PYOD do?
20      A.  It is a debt buyer. I'm sorry. I'm
21 correcting myself. It is an asset holding entity.
22 Sherman is the debt buyer.
23      Q.  Okay. Explain to me the distinction
24 between the two.
25      A.  Well, Sherman usually purchases the

Page 7

1  actual debts and then transfers it to PYOD. PYOD
2  never directly purchases anything from another
3  company.
4       Q.  Does PYOD have any employees?
5       A.  No, sir.
6       Q.  Do you know where PYOD was originally
7  incorporated?
8       A.  Delaware.
9       Q.  Do you know if PYOD is still in
10 existence today?
11      A.  It is.
12      Q.  Do you know the, just ballpark, the
13 total assets that PYOD holds?
14      A.  No, I don't.
15      Q.  Do you know what kind of debt PYOD
16 holds?
17      A.  I know they hold charged-off debt.
18      Q.  Any others that you know of?
19      A.  Not that I know of.
20      Q.  Is it your understanding is it all
21 charged-off debt?
22      A.  Again, I haven't seen every account
23 that they own, but the ones that I've seen are
24 charged-off accounts.
25      Q.  And tell me what your understanding of

Page 8

1  a charged-off account is.
2       A.  It's an account that the original
3  creditor has attempted to, I guess, collect it back
4  but were unable to, and they wrote it off and then
5  sold it at a loss.
6       Q.  Does PYOD retain the sale documents
7  that accompany the purchase of debt?
8       A.  I'm not really sure I understand the
9  question.
10      Q.  Okay. When debt is purchased by
11 Sherman there are certain documents that accompany
12 that purchase; is that correct?
13      A.  Correct.
14      Q.  There will be a bill of sale?
15      A.  Yes.
16      Q.  A listing of accounts?
17      A.  Yes.
18      Q.  Would there be underlying documents
19 like account records, billing statements?
20      A.  That would usually be handled through
21 Resurgent, and that sometimes can be part of the
22 sale or it can be something that's obtained after
23 the sale.
24      Q.  Okay.
25      A.  That really just depends on the

Page 9

1  purchase altogether.
2      Q.  Would it be transferred documents --
3      A.  Such as the --
4      Q.  -- or assignment documents where it
5  went from one entity to another?
6      A.  Yes.
7      Q.  Okay. And what entity keeps those
8  documents?
9      A.  Those are managed by Resurgent Capital
10 Services.
11     Q.  Okay. Do you know if PYOD actually
12 had or keeps any documents on its own related to the
13 Thompson account?
14     A.  Those are all kept and managed by
15 Resurgent Capital Services.
16 (PLF. EXH. 2, Bill of Sale, was marked for
17 identification.)
18 BY MR. HERRING:
19     Q.  Okay. I'm handing you Exhibit 2 to
20 your deposition.
21         And these are Bates stamped RES000001
22 1 through 12. I think they're consecutive. Will
23 you tell me what the first page of this is?
24     A.  The first page is a bill of sale
25 between the originator, in this case First USA Bank,

Page 10

1  NA, and a purchaser called B-Hold, LLC.
2      Q.  And the date of that sale was
3  March 29, 2000?
4      A.  Yes.
5      Q.  Okay. What do you know about B-Hold?
6  And that's B dash H-O-L-D, LLC.
7      A.  Aside from them purchasing accounts
8  from First USA Bank back in 2000, that's basically
9  it.
10     Q.  Do they have any relationship to --
11 scratch that.
12         Are they owned or a part of the
13 Sherman group of companies?
14     A.  No.
15     Q.  Do you know if First Bank USA is still
16 in business?
17     A.  I don't believe they are.
18     Q.  Okay. Looking down at the middle of
19 the page there's a sentence that says: Amounts due
20 to seller by purchaser in U.S. dollars by wire
21 transfer to be received by seller on March 30, 2000,
22 by 2:00 p.m. to Federal Reserve account after
23 confirming the bill of sale.
24         And then under that it says: First
25 USA Bank, NA, care of Federal Reserve Bank,

Page 11

1  Philadelphia.
2          Is the Federal Reserve Bank,
3  Philadelphia, do you understand that -- is that just
4  where First USA had its banking account that the
5  money would go into?
6      A.  That I'm not sure about, sir.
7      Q.  Okay. If you'll turn to the second
8  page. And by the way, are these documents that
9  Resurgent would have received as a part of the
10 purchase of Ms. Thompson's debt?
11     A.  Yes. This is the entire chain of
12 assignments starting from the original creditor
13 ultimately to PYOD.
14     Q.  Okay. What is a chain of assignment?
15     A.  It's a series of documents showing
16 basically where the account's been for its life. So
17 starting from the original creditor through various
18 other purchasers in this case and ultimately to
19 PYOD, LLC.
20     Q.  Okay. Why is the chain of assignment
21 important?
22     A.  It shows that ultimately PYOD is the
23 current owner of accounts.
24     Q.  And by accounts in this case you would
25 mean Ms. McIntyre or Ms. Thompson's account that was

Page 12

1  once the part of the First USA Bank portfolio?
2      A.  Correct.
3      Q.  Okay. If you'll turn to page 2. The
4  top says: Bill of sale No. 16.
5      A.  Okay.
6      Q.  What is this document?
7      A.  This document looks like it splits up
8  the B-Hold entities into various B-Line entities and
9  they're all listed below.
10     Q.  Okay. Where do you see B-Hold on
11 here?
12     A.  That was just from the first page.
13     Q.  Okay. So --
14     A.  But there's no B-Hold on the second
15 page that I can see.
16     Q.  Okay. The document reads at the top:
17 Each of the signatories hereto, open paren, each a
18 seller, for value received in pursuant to the terms
19 and conditions of the asset purchase agreement dated
20 September 23, 2011.
21         Do you know where the asset purchase
22 agreement is?
23     A.  No. I don't know where it is
24 currently.
25     Q.  Okay. As far as I know that wasn't

Page 13

1  produced to us. Is that something that is supposed
2  to be a part of this document, a part of this bill
3  of sale?
4    A.  No. The bill of sale just shows the
5  transfer.
6    Q.  Okay. What are the terms of the
7  condition -- and conditions of the asset purchase
8  agreement?
9    A.  I haven't seen it or reviewed it.
10   Q.  Well, what's your understanding of
11 what an asset purchase agreement normally -- what
12 the terms of an asset purchase agreement normally
13 are?
14   A.  Well, like you said, it basically
15 outlines the terms of the purchase and sale of an
16 account from one entity to another.
17   Q.  Does it govern the -- any -- does it
18 govern the way a debt is supposed to be collected?
19 In other words, does it lay out any conditions or
20 anything like that?
21   A.  Well, again, I haven't reviewed this
22 specific account, but generally speaking it never
23 specifically states this is how you are supposed to
24 collect the debt.
25   Q.  Well, this sale took place pursuant to

Page 14

1  the terms and conditions of the asset purchase
2  agreement, and you don't know what those terms and
3  conditions are as you sit here today?
4    A.  No. I haven't reviewed that specific
5  agreement.
6    Q.  Okay. Who would -- well, is there a
7  general agreement that you understand would apply to
8  this?
9    A.  I mean, again, I have seen numerous
10 agreements over the years, but I haven't seen this
11 specific one. So I couldn't really speak to exactly
12 what the terms and conditions were.
13   Q.  Okay. Who should have that document?
14   A.  Well, that's something that's retained
15 by Resurgent Capital Services on behalf of PYOD.
16       MR. HERRING: All right. Neil, do
17 know if you-all have been given that?
18       MR. MOORE: I haven't even asked for
19 it.
20       MR. HERRING: All right.
21 BY MR. HERRING:
22   Q.  And then it says, dated September 23,
23 2011. Is that when the sale of these -- of these
24 accounts was allegedly made to Sherman?
25   A.  Correct. This is one of the series

Page 15

1  accounts that would have been sold to Sherman
2  Originator III, LLC.
3    Q.  Is B-Hold one of the signatories to
4  this document?
5    A.  No. It doesn't appear to be.
6    Q.  You know the relationship between the
7  signatories to this document and B-Hold?
8    A.  No, I don't.
9    Q.  Do you know if they're related in any
10 way?
11   A.  I don't know that for a fact, no.
12   Q.  So, turning back to page one, the
13 account was sold from First USA Bank to B-Hold, LLC,
14 and then there's a purchase -- and then there's a
15 bill of sale between several entities, none of which
16 are B-Hold, to Resurgent -- to Sherman Originator
17 III, LLC and Sherman Financial Group, LLC; is that
18 correct?
19   A.  That is correct.
20   Q.  Do you know if there's any document
21 showing a transfer from B-Hold to any of the
22 signatories to this bill of sale on Bates 2 through
23 10?
24   A.  No. I don't know.
25   Q.  Would that be a part of the chain of

Page 16

1  title?
2    A.  I don't know if such a document
3  exists. So I don't know.
4    Q.  Well, in looking at a chain of title,
5  it's your understanding, isn't it, sir, that you
6  need to be able to trace the sale of an account from
7  the original creditor all the way to Sherman,
8  correct?
9    A.  Well, to PYOD, correct.
10   Q.  Okay. To Sherman and then to PYOD.
11 And it appears here that there's a missing link in
12 that chain; is that correct?
13   A.  Well, again, I don't know if there is
14 a missing link, but like you said there isn't
15 anything from specifically B-Hold to any of the
16 other entities on page 2.
17   Q.  If you'll turn back to page 1, about I
18 guess a little over halfway down, do you see the
19 line that says that this bill of sale is HQ without
20 recourse except as stated in the credit card account
21 purchase agreement; do you see that?
22   A.  I do.
23   Q.  And do you know if Resurgent or PYOD
24 has the credit card account purchase agreement?
25   A.  I don't know if PYOD or Resurgent

Page 17

1  would have that specific agreement between First USA
2  Bank and B-Hold.
3      Q.  Do you have any idea what the credit
4  account purchase agreement would say in regards to
5  the bill of sale or any recourse within that bill of
6  sale?
7      A.  No. I haven't reviewed it and it
8  would have been between two unaffiliated parties.
9  So I don't know what their standard procedures would
10 have been at the time this was signed.
11     Q.  Looking at page 2, there appear to be
12 several account categories listed such as B-Line,
13 that's B dash Line, Discharge 7-3Y, B-Line CVB, and
14 there's several others.
15         Do you know which account Ms. Thompson
16 was supposed to have been in?
17     A.  No, I don't.
18     Q.  Do you know if it was even in any of
19 those accounts -- categories?
20     A.  It was part of the purchase and sale.
21 So it would have had to have been in one of those
22 categories.
23     Q.  And how do you know it was part of the
24 purchase and sale?
25     A.  Well, through the documents that we

Page 18

1  have.
2      Q.  And which document is that?
3      A.  That's just chain of assignment
4  showing that the accounts were sold to PYOD, which
5  included Ms. McIntyre's account.
6      Q.  Okay. But I'm asking you, show me the
7  document in this chain of title that shows you
8  Ms. McIntyre's account was sold from the original
9  creditor all the way to PYOD.
10     A.  There isn't any document in the
11 series. This is a portfolio. It's not based on an
12 individual sale of one account.
13     Q.  Okay. But we've already established
14 that there's a missing link in the chain between
15 B-Hold and the list of sellers on bill of sale
16 number 16, Bates stamp 2, correct?
17     A.  Well, I didn't say there was a --
18         MR. MOORE: Object to the form of
19 that. Go ahead.
20         THE DEPONENT: I didn't say there was
21 a missing document. I just said there's nothing
22 showing a connection to B-Hold to these other
23 entities on page 2.
24 BY MR. HERRING:
25     Q.  And I didn't say missing documents.

Page 19

1  There's a missing link in the chain of title that we
2  discussed earlier, correct?
3      A.  Well, there -- right. There's nothing
4  from B-Hold directly to these entities and this
5  document that I can find.
6      Q.  Okay. If you'll turn to page 11 of
7  Exhibit 1.
8          Tell me what this document is and
9  purports to do?
10     A.  It's a transfer of assignment from
11 Sherman Originator III, LLC to PYOD, LLC.
12     Q.  And then are the assets identified in
13 Exhibit A? Is Exhibit A the document Bates stamped
14 12?
15     A.  Yes.
16     Q.  Is B-Hold listed anywhere on this
17 document?
18         MR. MOORE: 11 or 12?
19         MR. HERRING: 11.
20         THE DEPONENT: No.
21 BY MR. HERRING:
22     Q.  Do any of these entities listed on
23 Exhibit 11 have any relationship -- scratch that.
24         Do any of the entities listed on
25 Exhibit 11 --

Page 20

1          MR. MOORE: Page 11 of Exhibit 1.
2          MR. HERRING: I'm sorry -- page 11 of
3  Exhibit 1, are they owned or related to Sherman in
4  any way?
5          THE DEPONENT: Just Sherman Originator
6  III, LLC and PYOD. The other entities listed are
7  independent of them.
8  (PLF. EXH. 3, Data String, was marked for
9  identification.)
10 BY MR. HERRING:
11     Q.  I'm handing you Exhibit 3 to your
12 deposition. For the record, what is this document?
13     A.  This is something that we call the
14 data string. This identifies the accounts that were
15 purchased from the seller in this case.
16         MR. MOORE: And I don't want to get
17 too hyper technical here, but keep in mind you're
18 here for PYOD, not Resurgent, so...
19         THE DEPONENT: Right.
20         MR. MOORE: So if that's not something
21 that PYOD would know or keep or maintain, don't go
22 ahead and answer for Resurgent, okay?
23         THE DEPONENT: Understood.
24 BY MR. HERRING:
25     Q.  As a part of PYOD's receipt of the

Page 21

1 account from Sherman, would it have kept or
2 maintained this document?
3    A. Well, this represents the list of
4 accounts that were sold, and it would have been
5 maintained and managed by Resurgent Capital
6 Services.
7    Q. Okay. Is there any document other
8 than -- well, let me ask it this way.
9     What documents would Resurgent -- I'm
10 sorry, would PYOD have to show that it actually
11 owned this account?
12    A. Well, aside from that chain of
13 assignment, everything else is pretty much under
14 Resurgent on behalf of PYOD.
15    Q. Okay. So Resurgent keeps and
16 maintains documents on behalf of PYOD?
17    A. Right.
18    Q. Would it keep and maintain this
19 Exhibit 3 on behalf of PYOD?
20    A. Right. Yes.
21    Q. Is there a way to link Exhibit 3 to
22 any of the information found in the bill of sale or
23 transfer and assignment?
24    A. Yes. If you look on page 12 of
25 Exhibit 2.

Page 22

1    Q. Okay.
2    A. Exhibit 3 is basically the best way I
3 can describe it is a physical representation of the
4 accounts that were transferred over
5 electronically --
6    Q. Okay.
7    A. -- which Resurgent then maintains and
8 manages.
9    Q. I guess what I'm trying to understand
10 is, page 12 of Exhibit 2 has a transfer group and a
11 portfolio number, and under transfer batch it says,
12 NA. And what I'm trying to understand is, is there
13 any identifying information in Exhibit 3 that you
14 can relate back to or identify as a part of this
15 transfer group or this portfolio number?
16    A. From what I can see there's nothing
17 here specifically that ties it back to Exhibit 2.
18 But, again, this is just a physical, like, basically
19 a copy of something that would have been transferred
20 to Resurgent electronically.
21    Q. And where would this information have
22 come from in Exhibit 3?
23    A. Exhibit 3 comes from the seller. So
24 the seller upon selling the account passes the
25 accounts to PYOD, which are then immediately

Page 23

1 transferred to Resurgent and they maintain and
2 manage it from that point on.
3    Q. Okay. So by seller you mean Sherman
4 Originator?
5    A. Well, it -- yes. It did come through
6 Sherman Originator III, but prior to that from all
7 these other identified entities that are on
8 Exhibit 2.
9    Q. Do you know if PYOD through its own
10 efforts took any action to attempt to collect the
11 debt from Ms. Thompson?
12    A. The only thing PYOD did was place the
13 accounts with Resurgent Capital Services who manages
14 it on their behalf. That's all they did.
15    Q. And do you know who's on the board of
16 directors for PYOD?
17    A. No, I don't.
18    Q. Do you know who's the president or CEO
19 of PYOD?
20    A. I do know who the president is.
21    Q. Who's that?
22    A. His name is Kevin Branigan.
23    Q. And who's he?
24    A. He's the president of PYOD.
25    Q. What other titles does he have?

Page 24

1    A. He's also the president of LVNV
2 Funding.
3    Q. Any other titles that you're aware of?
4    A. Not that I'm aware of, no.
5    Q. Who is Les Gutierrez?
6    A. Les Gutierrez for Exhibit 2 is an
7 authorized representative for PYOD.
8    Q. And who is he employed by?
9    A. Well, he's currently retired, but I
10 don't know who he was actually employed by before
11 that.
12    Q. Okay. And you're employed by
13 Resurgent, correct?
14    A. Correct.
15    Q. So when you get a paycheck does it say
16 Resurgent at the top?
17    A. It does.
18    MR. HERRING: All right. All right.
19 That's all I have.
20    (Off-the-record.)
21    MR. HERRING: Back on the record.
22 (PLF. EXH. 4, PYOD, LLC - State of Alabama Document,
23 was marked for identification.)
24 BY MR. HERRING:
25    Q. I'm handing you Exhibit 4 to your

Page 25

1  deposition. Will you identify that?
2      A.   This is a document from the Secretary
3  of State for Alabama showing that PYOD is a foreign
4  limited liability company organized under Delaware
5  laws.
6      Q.   And it looks like it applied for
7  registration to do business in Alabama in 2008?
8      A.   One moment. Oh, right. Yes, it is.
9      Q.   And do you know if it's kept that
10 license or registration current to do business in
11 Alabama since then?
12     A.   Yes. If PYOD is required to be
13 registered, they will maintain and keep that license
14 until the state says otherwise.
15         MR. HERRING: Okay. All right.
16 That's all I have.
17         (The Witness, after having been advised
18 of his right to read and sign this transcript, does
19 waive that right.)
20         (Deposition concluded at 8:55 a.m.)
21
22
23
24
25

Page 27

1                    INDEX
2                              PAGE  LINE
3  JEAN PAUL TORRES              3    2
4  EXAMINATION                   3   18
5  BY MR. HERRING:
6  CERTIFICATE OF REPORTER      26    1
7
8      REQUESTED INFORMATION INDEX
   (No information was requested.)
9
10        PLAINTIFF'S EXHIBITS
11                             PAGE  LINE
12 PLF. EXH. 1, Re-Notice to Take     5   24
13 Deposition of 30(b)(6) Corporate
14 Rep. of PYOD, LLC
15 PLF. EXH. 2, Bill of Sale          9   16
16 PLF. EXH. 3, Data String          20    8
17 PLF. EXH. 4, PYOD, LLC - State of 24   22
18 Alabama Document
19
20
21
22
23
24
25

Page 26

1          CERTIFICATE OF REPORTER
2
3      I, Michele E. Becker, Registered Professional
4  Reporter and Notary Public for the State of South Carolina at
5  Large, do hereby certify that the foregoing transcript is a
6  true, accurate, and complete record.
7      I further certify that I am neither related to
8  nor counsel for any party to the cause pending or interested
9  in the events thereof.
10     Witness my hand, I have hereunto affixed my
11 official seal this 14th day of October, 2013 at Greenville,
12 Greenville County, South Carolina.
13
14
15
16
17
18
19
20
21        _____
22        Michele E. Becker,
23        Registered Merit Reporter
24        My Commission expires
25        November 21, 2021